Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Ex Kano S. Sams II (#192936)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
Email: lglancy@glancylaw.com
          rprongay@glancylaw.com
          esams@glancylaw.com

*Lead Counsel for Lead Plaintiff and the Class*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DALE DEASON, Individually and On Behalf of All Others Similarly Situated,<br><br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>SUPER MICRO COMPUTER, INC., CHARLES LIANG, and HOWARD HIDESHIMA,<br><br>　　　　　　　　　　Defendants. | Case No. 5:15-cv-04049-EJD<br><br>**CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff Andrew Wanca ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Super Micro Computer, Inc. ("Super Micro" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports, and other public statements issued by, or about, the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons and/or entities who purchased or acquired the Company's common stock between September 15, 2014 and November 10, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Defendant Super Micro develops and provides high-performance server solutions based on modular and open-standard architecture. The Company offers a range of server, storage, blade, workstation, and full rack solutions, as well as networking devices, server management software, and technology support and services. Super Micro also provides a range of application optimized server solutions, including rackmount and blade server systems. Additionally, the Company provides server subsystems and accessories comprising of server boards, chassis, and power supplies. Super Micro also offers other system accessories, including microprocessors, memory, and disc drives. The Company provides its products to data center, cloud computing, enterprise IT, big data, high-performance computing, and embedded markets.

3. Super Micro was founded in 1993 and is headquartered in San Jose, California. The Company's shares trade on the NASDAQ exchange under the ticker symbol "SMCI."

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company improperly recorded expenses and revenues in its financial reports; (2) as a result, the Company's reported net income was misstated; (3) the Company lacked adequate internal financial controls; and (4) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.  Defendants, moreover, failed to identify additional deliverables provided to customers in connection with sales transactions to manipulate the Company's financial results when Super Micro faced trouble meeting guidance.

5.      On August 31, 2015, post-market, Super Micro announced that the Company "has determined that it is unable to file its Annual Report on Form 10-K for the fiscal year ended June 30, 2015 within the prescribed time period without unreasonable effort or expense. [Super Micro] recently discovered certain irregularities regarding certain marketing expenses and additional time is required for [the Company] to complete its investigation of the matter."

6.      On this news, shares of Super Micro declined $2.58 per share, or 9.43%, to close at $24.77 on September 1, 2015.  Additionally, on November 10, 2015 – after the close of the market – Super Micro issued a Form NT 10-Q – Notification of Late Filing with the SEC.  Within the Form NT 10-Q, the Company stated that "[t]he Company has determined that certain contracts for product extended warranties were recorded as revenue in prior periods instead of being deferred and amortized over the contractual period."  On this news, the Company's stock price declined $3.07 per share, or 10.5%, to close at $26.18 per share on November 11, 2015.

7.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

8.     The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

10.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).   Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

11.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange located in this District.

**PARTIES**

12.     Plaintiff Andrew Wanca, as set forth in the certification previously filed in this action which is incorporated by reference herein, purchased the Company's common stock during the Class Period and has been damaged thereby.

13.     Defendant Super Micro Computer, Inc. is a Delaware corporation with its principal executive offices located at 980 Rock Avenue, San Jose, California 95131.   Super Micro's common stock trades on the NASDAQ under the ticker symbol "SMCI."

14.     Defendant Charles Liang ("Liang") has served at all relevant times as the Company's Chief Executive Officer.

15.     Defendant Howard Hideshima ("Hideshima") has served at all relevant times as the Company's Chief Financial Officer.

16.     Defendants Super Micro, Liang, and Hideshima are collectively referred to herein as "Defendants."   Defendants Liang and Hideshima are collectively referred to herein as the "Individual Defendants."

17.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of the Company, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects.  Additionally, as set forth more fully below, the Individual Defendants have access to material adverse non-public information concerning the Company.  Because of their positions within the Company, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

18.     The Individual Defendants are liable as direct participants in the wrongs alleged herein.   In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful

conduct alleged.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

19.     The Individual Defendants, because of their positions within the Company, controlled and/or possessed the authority to control the contents of the Company's reports, press releases, and presentations to securities analysts and, through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged to be misleading herein, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

20.     The Individual Defendants, as senior executive officers and/or directors – and as controlling persons of a publicly-traded company whose common stock was, and is, governed by the federal securities law – had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

21.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud and/or deceit on purchasers of the Company's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  This scheme: (1) deceived the investing public regarding the Company's business, operations and management, and the intrinsic value of the Company's common stock; (2) enabled the Company to obtain additional capital at favorable prices, create a public market for its

common stock, and gain access to the public equity markets; and (3) caused Plaintiff and members of the Class to purchase the Company's common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

22.     Defendant Super Micro develops and provides high-performance server solutions based on modular and open-standard architecture.  The Company offers a range of server, storage, blade, workstation, and full rack solutions, as well as networking devices, server management software, and technology support and services.  The Company also provides a range of application optimized server solutions, including rackmount and blade server systems; and server subsystems and accessories comprising server boards, and chassis and power supplies, as well as other system accessories, including microprocessors, and memory and disc drives.  Super Micro offers its products to data center, cloud computing, enterprise IT, big data, high performance computing, and embedded markets.

23.     The Company was founded in 1993 and is incorporated in Delaware, with headquarters in San Jose, California.  The Company's shares trade on the NASDAQ exchange under the ticker symbol "SMCI."

## MATERIALLY FALSE AND MISLEADING STATEMENTS

24.     The Class Period begins on September 15, 2014, when Super Micro filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal quarter and year ended June 30, 2014 (the "2014 10-K").  For the quarter, the Company reported net income of $16.55 million, or $0.34 per diluted share, on revenue of $428.07 million, compared to net income of $8.43 million, or $0.19 per diluted share, on revenue of $322.33 million for the same period in the prior year.  For fiscal year 2014, the Company reported net income of $54.16 million, or $1.16 per diluted share, on revenue of $1.47 billion, compared to net

income of $21.28 million, or $0.48 per diluted share, on revenue of $1.16 billion for fiscal year 2013.

25.     The 2014 10-K stated, in part:

Sales and marketing expenses.  Sales and marketing expenses consist primarily of salaries and incentive bonuses for our sales and marketing personnel, costs for tradeshows, independent sales representative fees and marketing programs.  From time to time, we receive cooperative marketing funding from certain suppliers. Under these programs, we are reimbursed for certain marketing costs that we incur as part of the joint promotion of our products and those of our suppliers. These amounts offset a portion of the related expenses and have the effect of reducing our reported sales and marketing expenses.  Similarly, we from time to time offer our distributors cooperative marketing funding which has the effect of increasing our expenses.  The timing, magnitude and estimated usage of our programs and those of our suppliers can result in significant variations in reported sales and marketing expenses from period to period.  Spending on cooperative marketing, either by us or our suppliers, typically increases in connection with significant product releases by us or our suppliers.

26.     The 2014 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.  Specifically, the Individual Defendants represented:

I, [Charles Liang and Howard Hideshima], certify that:

I have reviewed this annual report on Form 10-K of Super Micro Computer, Inc.;

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the

registrant and have:

a        Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b        Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c        Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d        Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

:        The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a        All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b        Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

27.     On October 21, 2014, Super Micro issued a press release and filed a Form 8-K with the SEC announcing the Company's financial and operating results for the fiscal quarter ended September 30, 2014 (the "Q1 2015 8-K"). For the quarter, the Company reported net income of

$20.86 million, or $0.42 per diluted share, on revenue of $443.32 million, compared to net income of $7.70 million, or $0.17 per diluted share, on revenue of $309.02 million for the same period in the prior year.

28.     In the Q1 2015 8-K, the Company reported Sales and Marketing expenses of $11 million for the quarter, compared to Sales and Marketing expenses of $8.87 million for the same period in the prior year.  In the Q1 2015 8-K, the Company stated, in part:

> The Company expects net sales of $440 million to $480 million for the second quarter of fiscal year 2015 ending December 31, 2014.  The Company expects non-GAAP earnings per diluted share of approximately $0.44 to $0.50 for the second quarter.

> "We began fiscal 2015 with an exceptional first quarter of record revenue and profits. In the first quarter, we grew revenues 43.5% over last year and posted our fourth consecutive quarter of record results. This again outperformed multiple times the industry growth rate. With 57.7% of our revenue coming from systems based on our Storage, GPU/Xeon Phi, Twin, MicroCloud and Network Switches, we continue to improve margin through a mix of higher value system products," said Charles Liang, Chairman and CEO. "As we ship our latest X10 generation Haswell DP products, a brand new I/O optimized Ultra server architecture and industry-leading hot-swappable NVMe solutions, we are confident our technology innovation will continue to drive our growth momentum into the remainder fiscal 2015."

29.     On November 6, 2014, Super Micro filed a quarterly report on Form 10-Q with the SEC reiterating the financial and operating results previously announced in the Q1 2015 8-K (the "Q1 2015 10-Q").

30.     The Q1 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants similar to the certifications referenced above, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

31.     On January 20, 2015, Super Micro issued a press release and filed a Form 8-K with the SEC announcing the Company's financial and operating results for the fiscal quarter ended December 31, 2014 (the "Q2 2015 8-K").  For the quarter, the Company reported net income of

$31.24 million, or $0.61 per diluted share, on revenue of $503.01 million, compared to net income of $13.34 million, or $0.30 per diluted share, on revenue of $356.36 million for the same period in the prior year.

32.     In the Q2 2015 8-K, the Company reported Sales and Marketing expenses of $11.16 million for the quarter, compared to Sales and Marketing expenses of $8.98 million for the same period in the prior year.  In the Q2 2015 8-K, the Company stated, in part:

> The Company expects net sales of $450 million to $500 million for the third quarter of fiscal year 2015 ending March 31, 2015.  The Company expects non-GAAP earnings per diluted share of approximately $0.46 to $0.52 for the third quarter.

> "Last quarter we achieved our fifth consecutive record high revenue which was 41.2% higher than last year and we reached our goal of $2 billion annual run rate for revenues in a quarter.  Not only was this quarter outstanding from a revenue perspective, but we also continued to improve our operating margin.  This performance was driven by a significant increase in our new Haswell product shipments in the first full quarter since its launch, and we are confident that a strong cycle of technology transition is underway.  Strength in Storage and Cloud market verticals were part of a record for server systems revenue at 60.1%," said Charles Liang, Chairman and Chief Executive of Supermicro. "Supermicro has the broadest product portfolio of application optimized server/storage technology in the industry featuring our Ultra line of servers as well as many choices for multi-node servers including our Twin architecture, Blades, MicroCloud and MicroBlade.  We are well positioned for growth and market share gains."

33.     On February 9, 2015, Super Micro filed a quarterly report on Form 10-Q with the SEC reiterating the financial and operating results previously announced in the Q2 2015 8-K (the "Q2 2015 10-Q").

34.     The Q2 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants similar to the certifications referenced above, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

35.     On April 21, 2015, Super Micro issued a press release and filed a Form 8-K with the SEC announcing the Company's financial and operating results for the fiscal quarter ended March 30, 2015 (the "Q3 2015 8-K").   For the quarter, the Company reported net income of $23.06 million, or $0.44 per diluted share, on revenue of $471.23 million, compared to net income of $16.57 million, or $0.35 per diluted share, on revenue of $373.76 million for the same period in the prior year.

36.     In the Q3 2015 8-K, the Company reported Sales and Marketing expenses of $12.50 million for the quarter, compared to Sales and Marketing expenses of $9.42 million for the same period in the prior year.   In the Q3 2015 8-K, the Company stated, in part:

> The Company expects net sales of $510 million to $560 million for the fourth quarter of fiscal year 2015 ending June 30, 2015.   The Company expects non-GAAP earnings per diluted share of approximately $0.53 to $0.62 for the fourth quarter.

> "Supermicro again delivered industry leading growth in the third quarter with 26.1% year over year growth in a seasonally affected quarter.   We continued our strong pace of growth in our server and storage solutions business contributing 64.1% of total revenue and with 53.9% of revenues coming from the OEM and Direct customers.   Storage, GPU/Xeon Phi, and our Twin family solutions continue to grow strongly year over year," said Charles Liang, Chairman and CEO.   "As we approach the final quarter of this fiscal year we are excited about our opportunities to improve our strong growth trend.   Our offerings for Storage, HPC, Enterprise, Datacenter, Cloud and Service are well positioned with the latest technologies to enable Supermicro to win market share."

37.     On May 7, 2015, Super Micro filed a quarterly report on Form 10-Q with the SEC reiterating the financial and operating results previously announced in the Q3 2015 8-K (the "Q3 2015 10-Q").

38.     The Q3 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants similar to the certifications referenced above, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

39.     On August 4, 2015, Super Micro issued a press release and filed a Form 8-K with the SEC announcing the Company's financial and operating results for the fiscal quarter and year ended June 30, 2015.  For the quarter, the Company reported net income of $26.70 million, or $0.51 per diluted share, on revenue of $573.59 million, compared to net income of $16.55 million, or $0.34 per diluted share, on revenue of $428.07 million for the same period in the prior year.  For fiscal year 2015, the Company reported net income of $101.86 million, or $2.03 per diluted share, on revenue of $1.99 billion, compared to net income of $54.16 million, or $1.16 per diluted share, on revenue of $1.47 billion for fiscal year 2014.  The Company also reported Sales and Marketing expenses of $14.20 million for the quarter, compared to Sales and Marketing expenses of $10.76 million for the same period in the prior year, and Sales and Marketing expenses of $48.85 million for fiscal year 2015, compared to Sales and Marketing expenses of $38.01 million for fiscal year 2014.  In the Form 8-K, the Company stated, in part:

> The Company expects net sales of $520 million to $580 million for the first quarter of fiscal year 2016 ending September 30, 2015.  The Company expects non-GAAP earnings per diluted share of approximately $0.49 to $0.59 for the first quarter.

> "Supermicro delivered record revenues in the fourth quarter of 34% growth over last year and posting $1.99 billion for the full fiscal year 2015 which was 35.7% above last year.  Revenue related to our storage solutions grew 79% year over year in the fourth quarter as storage has become a strategic growth segment with contributions from both traditional and next generation storage solutions.  Our FatTwin solutions were also a key growth driver this quarter with over 100% growth year over year and sales of our new MicroBlade solutions grew strongly for a new product category," said Charles Liang, Chairman and CEO.  "Looking to 2016 we have never been stronger in terms of leading products like Ultra, GPU/Xeon Phi, Storage, MicroBlade, and our software and service offerings. In order to support our growth, we are in the process of completing a 30% capacity addition in our San Jose and Europe manufacturing operations.  We believe that we are well positioned for continued growth and market share gains."

40.     Also on August 4, 2015, the Company issued an earnings release for the fourth quarter of 2015, with guidance to the first quarter of 2016: "The Company expects net sales of $520 million to $580 million for the first quarter of fiscal year 2016 ending September 30, 2015.

The Company expects non-GAAP earnings per diluted share of approximately $0.49 to $0.59 for the first quarter."

41.     The statements referenced in ¶¶24-40 above were materially false and/or misleading because the Company's financial results were materially misstated and because they misrepresented and failed to disclose adverse facts, which were known to defendants or recklessly disregarded by them.  For instance, within Super Micro's Form 10-K issued on September 10, 2015, Defendants considered accounting for "warranty obligation" as a "critical accounting policy."  However, since the Company's restatement does not correct expense for warranty – and since the term "extended warranty" does not exist within the Form 10-K filed on September 10, 2015 – the "extended warranty" of the Company's Form 10-K/A was apparently beyond the warranty obligation described in Super Micro's Form 10-K.  Indeed, the following language in the Company's Form 10-K filed on September 10, 2015 apparently refers to "extended-warranty:"

> "The Company has an immaterial amount of service revenue relating to on-site service and non-warranty repairs. ***Revenue for on-site service is recognized over the contracted service period***, and revenue for non-warranty repair service is recognized upon shipment of the repaired units to customers. ***Service revenue has been less than 10% of net sales for all periods presented and is not separately disclosed***."

42.     The following facts also demonstrate that Defendants acted with knowledge or deliberate recklessness: (1) even though the critical accounting policy in the Company's Form 10-K describes non-extended warranty, it is nevertheless a warranty; (2) the very long duration of the period in which the Company's errors are repeatedly committed (three years and one quarter); (3) Defendants' deliberate non-disclosure of service revenue amounts; and (4) the small number of system sales in a quarter (for example, 84 sales contracts in the first quarter of 2016).

43.     Super Micro's errors, moreover, occurred in several geographic regions, demonstrating that the errors were not isolated incidents:

| 10/22 Investor presentation, page 5 | | 10-Q | Error |
|---|---|---|---|
| USA - 65.4% | 346,774 | 338,696 | 8,078 |
| Eurpoe - 16.6% | 88,019 | 86,826 | 1,193 |
| Asia - 14.2% | 75,293 | 74,657 | 636 |
| Other -3.8% | 20,149 | 19,439 | 710 |
| | 530,235 | 519,618 | 10,617 |

44.   As a result, Defendants' failure to identify additional deliverables provided to customers as a part of sales transactions was a manipulation device employed by Defendants when Super Micro faced trouble meeting guidance.

45.   Accounts from CWs also demonstrate that Defendants acted with scienter.  CW1 was a sales account manager at Super Micro from January 2013 through February 2014.  CW1 stated that the Company's marketing team was very small and corrupt.  Specifically, CW1 stated that the Company's marketing department would give away a lot of Super Micro's products, but would fail to account for the products or where the products were sent.  CW1 stated that this practice was most common with Intel CPU's.  CW1 also stated that his manager would have no problem compensating Super Micro customers or distributors using marketing expenses.  For instance, CW1 stated that the Company's customers would buy Super Micro's products and obtain points.  According to CW1, the points were then used to obtain marketing-related merchandise.  CW1 also stated that Super Micro – particularly CEO Liang and the Company's Vice President of Business Development – would assign weekly quotas.  According to CW1, the quotas that were set were unrealistic.

46.   CW2 served as a credit and collections analyst at Super Micro from October 2013 through March 2015.  CW2 stated that Super Micro had a lot of accounts receivable on the Company's books.  CW2 stated that the Company's collections department consisted of only four collectors and that they were serving approximately 1,400 accounts.  CW2 stated that the volume with respect to accounts receivable was insane.  Additionally, CW2 stated that the Company's

marketing department had weekly co-op programs and that individuals in marketing might be under budget for particular campaigns.   If such were the case, the Company's marketing department would move co-op dollars from one customer to another to make up the difference.

47.     CW3 was an administrative assistant at Super Micro from February 2015 through November 2015.   According to CW3, the Company's sales people would have to obtain CEO Liang's signature on sales orders based upon the size of the order.   CW3 believes that the threshold was $1 million.

### THE TRUTH BEGINS TO EMERGE

48.     On August 31, 2015, post-market, Super Micro announced that the Company "has determined that it is unable to file its Annual Report on Form 10-K for the fiscal year ended June 30, 2015 within the prescribed time period without unreasonable effort or expense. [Super Micro] recently discovered certain irregularities regarding certain marketing expenses and additional time is required for [the Company] to complete its investigation of the matter."

49.     On the same date, the Company filed a Form NT 10-K – Notification of Late Filing with the SEC with respect to the Company's Form 10-K.   Within the Form NT 10-K, Super Micro stated that "[t]he Registrant recently discovered certain irregularities regarding certain marketing expenses and additional time is required for the Registrant to complete its investigation of the matter."

50.     On this news, shares of Super Micro Computer declined $2.58 per share, or 9.4%, to close at $24.77 on September 1, 2015.

51.     On September 10, 2015, Super Micro filed its Form 10-K with the SEC.   Within the Form 10-K, Defendants made no reference to the Company's "irregularities regarding certain marketing expenses."

52.     On October 8, 2015, Super Micro filed a Form 8-K with the SEC in which the Company preannounced a shortfall in revenue relative to the guidance that the Company provided on August 4, 2015.  Among other things, the Company stated:

> ·   "The company now anticipates that it will report revenue for its first quarter of fiscal 2016 in the range of $529 million to $530 million.  This compares to the company's previous guidance range of $520 million to $580 million."
>
> ·   "Non-GAAP gross margin is expected to be approximately 15.6% to 15.7%"
>
> ·   "The company also anticipates that its non-GAAP earnings per share will be in a range of $0.44 to $0.45."

53.     Also on October 8, 2015, the Company issued revenue and profit warnings for the first quarter of 2016,  and the Company's press release admitted:

> "The company anticipates that it will report non-GAAP operating expenses for first fiscal quarter between $2.0 million and $3.0 million higher than the fourth fiscal quarter of 2015. The increase in expenses was primarily due to higher compensation expenses and headcount increases to support new technologies and higher legal *and other expenses associated with our previously disclosed review of certain marketing expenses.*"

54.     The guidance that Defendants provided on August 4, 2015 was overly optimistic because Defendants were aware of – or deliberately reckless in not knowing – of the Company's practice of channel staffing and the existence of deteriorating Days Sales Outstanding ("DSO") and inventory days.   Indeed, in a report dated August 4, 2015, a Super Micro analyst – Susquehanna Financial Group, LLP ("Susquehanna") stated that "[o]n the call, SMCI stated that Subsystem distributor demand was strong, particularly in the U.S., which could suggest. . . distributor inventory build."  On the contrary, the Company's subsystems sales actually sank in the first quarter of 2016:

| | | | | | Oct-22 Release |
|---|---|---|---|---|---|
| As reported | Q1-15 | Q2-15 | Q3-15 | Q4-15 | Q1-16 |
| Server systems | 255,609 | 302,256 | 301,953 | 353,790 | 366,923 |
| Subsystems and accessories | 187,713 | 200,758 | 169,272 | 219,804 | 163,312 |
| | 443,322 | 503,014 | 471,225 | 573,594 | 530,235 |

55.     Indeed, in a subsequent Susquehanna report on October 8, 2015, Susquehanna stated that "[w]e believe management was **overly aggressive** with guidance in the face of macro/industry uncertainty and annual revenue cadence . . . ."

56.     The Company's relatively high ratios, moreover, are consistent with channel stuffing:

|  | 2014 | 2014 |  |  | 2015 | 2015 |
|---|---|---|---|---|---|---|
|  | March | June |  |  | March | June |
| sales | 373,755 | 428,069 |  |  | 471,225 | 573,594 |
| cost of sales | 316,491 | 361,672 |  |  | 394,405 | 483,828 |
|  |  |  |  |  |  |  |
| EOP A/R | 101,714 | 212,738 |  |  | 221,561 | 322,594 |
| EOP inventory | 182,028 | 315,837 |  |  | 430,382 | 463,493 |
|  |  |  |  |  |  |  |
| DSO | 24.5 | 44.7 |  |  | 42.3 | 50.6 |
| Inventory days | 51.8 | 78.6 |  |  | 98.2 | 86.2 |

57.     Analysts, moreover, discussed these issues.  For example, in an August 5, 2015 Company Note, Roth Capital Partners, LLC ("Roth") noted that the Company's "[c]ash declined $13.8 million in the quarter due to the combination of increasing receivables . . . ."

58.     Additionally, on November 11, 2015, Susquehanna issued a report that classified the Company's "irregularities regarding certain marketing expenses" and the extended warranty GAAP violation in the same basket of internal control deficiencies.  As a result, the Company's price declines of August 31, 2015, October 9, 2015, and November 10, 2015 were part of the same contextual timeline:

"This delay follows a series of disappointing events from earlier this year; from port delays (and thus impacting shipment to customers), to **recognition of marketing expenses** in the recent late 10-K filing, and now the **recognition of warranties**."

"We remind investors that SMCI required an extension for its 10-K as well. Back on 8/31, SMCI requested an extension to file its 10-K due to an internal review of certain marketing expenses. It is unclear to us whether the issues experienced with

the late 10-K filing are related at all to the late 10-Q filing (likely not), however, we believe the 2 incidents are hampering SMCI's ability to instill positive investor sentiment in the stock."

59.    On October 8, 2015, the Company filed a Form 8-K with the SEC.  Within the Form 8-K, Super Micro stated the following:

> The company now anticipates that it will report revenue for its first quarter of fiscal 2016 in the range of $529 million to $530 million. This compares to the company's previous guidance range of $520 million to $580 million.
>
> Non-GAAP gross margin is expected to be approximately 15.6% to 15.7%.
>
> The company anticipates that it will report non-GAAP operating expenses for first fiscal quarter between $2.0 million and $3.0 million higher than the fourth fiscal quarter of 2015. The increase in expenses was primarily due to higher compensation expenses and headcount increases to support new technologies and higher legal and other expenses associated with our previously disclosed review of certain marketing expenses.
>
> The company also anticipates that its non-GAAP earnings per share will be in a range of $0.44 to $0.45. This compares to the company's previous guidance of $0.49 to $0.59.
>
> The company ended the first quarter of fiscal 2016 with approximately $113.6 million in cash and cash equivalents, and short and long term investments compared to $98.1 million at the end of fourth quarter of fiscal 2015.

60.    On this news, the Company's stock price dropped $4.92 per share, or 15.5%, to close on October 9, 2015 at $26.90 per share.

61.    On October 22, 2015 – after the close of the market – Super Micro issued a Form 8-K with the earnings release.  The Company provided the following information:

| Q1-16 | GAAP | Adj. | NonGAAP | | |
|---|---|---|---|---|---|
| Net sales | 530,235 | | **530,235** | above Oct-8 guide | |
| Cost of sales | 447,403 | 240 | 447,163 | | |
| Gross profit | 82,832 | | 83,072 | | |
| | 15.6% | | **15.7%** | highr end of Oct-8 guide | |
| | | | | | |
| INCOME FROM OPERATIONS | 32,057 | 3,876 | 35,933 | | |
| Non-GAAP  Operating Margin | (in slide 10) | | **6.8%** | | |
| | | | | | |
| NET INCOME | 20,494 | 2,928 | 23,422 | | |
| Diluted - Non-GAAP #shares | | | 52,042 | | |
| Non-GAAP NET INCOME PER COMMON SHARE – DILUTED | | | **0.45** | highr end of Oct-8 guide | |

62.     On November 10, 2015 – after the close of the market – Super Micro issued a Form NT 10-Q – Notification of Late Filing with the SEC.  Within the Form NT 10-Q, the Company stated the following:

> "The Company has determined that certain contracts for product extended warranties were recorded as revenue in prior periods instead of being deferred and amortized over the contractual period.  The Company expects to make this adjustment in the Form 10-Q as the Company does not expect the change to be material to its previously filed financial statements."

63.     On this news, the Company's stock price declined $3.07 per share, or 10.5%, to close at $26.18 per share on November 11, 2015.  The Company's Form NT 10-Q issued on November 10, 2015 contained no quantitative information and therefore represented a partial corrective disclosure.

64.     On November 16, 2015, the Company filed its Form 10-Q for the quarterly period ended September 30, 2015.  On the same day, the Company also filed a Form 10-K/A.  Super Micro's filings with the SEC corrected the Company's statements on internal controls.  The Company also filed a Form 8-K/A that amended Super Micro's Form 8-K filed on October 22, 2015.  Within Super Micro's Form 10-Q, the Company stated:

1

**Note 12.      Prior Period Adjustment Recorded in Current Quarter**

In November 2015, the Company identified errors related to revenue which was recognized prior to meeting US GAAP revenue recognition criteria which ***impacted fiscal years 2013, 2014 and 2015.***  The Company determined that certain contracts for extended warranties on products were recorded as revenue at the time of sale of the product in prior periods instead of being deferred and amortized over the contractual warranty period.  ***The cumulative impact of this error pertaining to prior periods through June 30, 2015 was to overstate net sales and net income by $9,259,000*** and $5,926,000, respectively.  To compute the amount of the error, the Company determined a best estimated selling price for the extended warranty contracts based on prices charged to customers for these contracts when sold separately.  ***This error was corrected in the quarter ended September 30, 2015 by reducing net sales by $9,259,000 and net income by $5,926,000***, respectively.

The Company assessed the materiality of these errors on each of the fiscal years ended June 30, 2013, 2014 and 2015, and concluded that the errors were not material to any of these periods.  The Company also concluded that ***recording an out-of-period correction*** would not be material to the three months ended September 30, 2015. Consequently, the accompanying condensed consolidated statement of operations for the three month period ended September 30, 2015 have been corrected.

65.      Notably, Super Micro did not state that the errors identified within the Form 10-Q were immaterial with respect to each quarter in FY14 and FY15.

66.      Additionally, within Super Micro's Form 8-K/A, the Company stated:

The Company has determined the cumulative impact on revenue that should have been deferred for the applicable contracts for the three prior fiscal year period ended June 30, 2015 was $9.3 million ***and for the quarter ended September 30, 2015 was $1.3 million***.  As a result, the condensed consolidated statement of operations and condensed consolidated balance sheet included in the Company's Form 10-Q reflect aggregate net sales for the quarter ended September 30, 2015 of $519.6 million, $10.6 million less than reflected in the October Press Release.  This deferred revenue will be recognized through January 2019.  The reduction in net sales also resulted in a reduction in GAAP net income of $6.8 million, or $0.13 per diluted share, from $20.5 million reported in the October Press Release to $13.7 million in the Form 10-Q. GAAP net income of $0.8 million or $0.02 per diluted share was related to the quarter ended September 30, 2015.

67.      Indeed, the errors that Super Micro reported were material with respect to the Company's financial statements for the first quarter of 2016 (as well as for the other quarters during the Class Period).  First, the misstatement was material regarding Super Micro's reporting

of net sales.  Super Micro reported net sales of $519,618,000 in its Form 10-Q.  The out-of-period adjustment that Super Micro reported was $9,259,000.  The restated net sales amount was $528,877,000.  Thus, the error reported by the Company in net sales regarding Super Micro's August 22, 2015 release was $1,358,000.  This error, therefore, constituted a material error because $528,877,000 was below the lower end of the guidance that the Company provided on August 10, 2015 of $529 million to $530 million.

68.     Super Micro's errors were also material with respect to the Company's non-Generally Accepted Accounting Principles ("GAAP") gross margin:

|  | GAAP | | | Non-GAAP |
| --- | --- | --- | --- | --- |
|  | 8-K, 10/22 | error | adj. | 10-Q, 11/16 |
| Net sales | 530,235 | (1,358) |  | 528,877 |
| Cost of sales | 447,403 |  | (240) | 447,163 |
| Gross Profit | 82,832 |  |  | 81,714 |
|  |  |  |  | 15.5% |

69.     As the above chart reflects, the guidance that the Company provided on October 8, 2015 was for 15.6% to 15.7%.  In the Company's October 22, 2015 release (and within Slide 16 of the Company's investor presentation on the same date), this metric met the Company's guidance:

|  | Q1'16 | Q4'15 | Q1'15 |
| --- | --- | --- | --- |
| **Net Sales** | $530,200,000 | $573,600,000 | $443,300,000 |
| **Non-GAAP Gross Margin** | 15.7% | 15.7% | 15.7% |

70.     The restated metric, therefore, missed the Company's guidance and is therefore material.  Gross margin, moreover, was a key metric for the Company.

71.     Additionally, the Company's errors also had a material effect on the Company's non-GAAP net income per common share – diluted.  As indicated above, the guidance that the Company provided on October 8, 2015 was "a range of $0.44 to $0.45."  The actual range

announced on October 22, 2015 was at the higher end of the range – $0.45.  The Company's

restated metric – based upon the Company's Form 10-Q – was below the guidance provided by

the Company:

| | Net Income in 10-Q | 13,699 | | |
|---|---|---|---|---|
| | Out-of-period adj. | 5,926 | per Note 12 | |
| | "restated" net incme | 19,625 | | |
| | Net imcome in 10/22 release | 20,494 | | |
| | ERROR impact on net income | 869 | | |
| | | | | |

| | GAAP | | | Non-GAAP |
|---|---|---|---|---|
| | 8-K, 10/22 | error | adj. | 10-Q, 11/16 |
| Net Income | 20,494 | (869) | 2,928 | 22,553 |
| Diluted - Non-GAAP #shares | | | | 52,042 |
| Non-GAAP NET INCOME PER COMMON SHARE – DILUTED | | | | **0.43** |

72.    Super Micro's restated metric for non-GAAP net income per common share –
diluted was below the Company's guidance range and was therefore material.

73.    The Company's errors also had a material impact upon Super Micro's non-GAAP
operating margin.  Although this metric was not included in the guidance that the Company
provided on October 8, 2015, the metric was contained on page 10 of the Company's October 22,
2015 investor presentation and on the call that Super Micro conducted with analysts: "[w]e have
put out targets previously and we are still – we have not changed those targets for our gross
margins, that being at 16% to 18% and operating margins at 7% to 9% within the next few years."

74.    The actual guidance that Super Micro provided in the Company's October 22, 2015
release was 6.8%, close to the Company's stated "target" range.  The restated metric, however, is
6.5%:

| | | GAAP | | | Non-GAAP |
|---|---|---|---|---|---|
| | | 8-K, 10/22 | error | adj. | 10-Q, 11/16 |
| Net sales | | 530,235 | (1,358) | | 528,877 |
| Operating income | | 32,057 | (1,358) | 3,876 | 34,575 |
| | | | | | **6.5%** |

75.     Thus, the Company's non-GAAP operating margin was significantly lower than the margin that Super Micro reported on October 22, 2015.

76.     The Company's errors were also material because they affected the Company's "systems" business.  In its 10-Q, the Company categorized sales into two product lines:

| As reported | Q1-15 | Q2-15 | Q3-15 | Q4-15 | Oct-22 Release Q1-16 |
|---|---|---|---|---|---|
| Server systems | 255,609 | 302,256 | 301,953 | 353,790 | 366,923 |
| Subsystems and accessories | 187,713 | 200,758 | 169,272 | 219,804 | 163,312 |
|  | 443,322 | 503,014 | 471,225 | 573,594 | 530,235 |

77.     The Company's "systems" business line had a higher margin and a higher growth rate.  Indeed, the Company's systems sales drove the Company's gross margins and operating margins.

78.     On November 16, 2015, the Company filed a 10-K/A to amend Super Micro's statements regarding internal control over financial reporting:

> "We did not have a control in place that is designed to review underlying sales contracts for certain **extended warranty** to identify additional deliverables provided to customers as a part of sales transactions entered into by us.  As a result, certain **extended warranty** revenue recorded in prior periods did not meet the criteria for revenue recognition and should have been deferred and recorded over the contractual period of the **extended warranty**."

79.     On February 4, 2016, Super Micro filed its Form 10-Q for the quarterly period ended December 31, 2015.  Within the Form 10-Q, the Company stated the following:

> **Evaluation of Effectiveness of Disclosure Controls and Procedures**
>
> Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) and 15d-15(e) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act").  The evaluation considered the procedures designed to ensure that information required to be disclosed by us in the reports filed or submitted by us under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and

Exchange Commission rules and forms and is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. *Due to the material weakness in internal control over financial reporting described below, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were not effective, and were not operating at the reasonable assurance level as of December 31, 2015.*

*In November 2015, our management identified an error in accounting treatment of certain contracts with extended warranty provisions. Our management has identified a deficiency in the design of a control that represents a material weakness in internal control over financial reporting as follows:*

*We did not have a control in place that is designed to review underlying sales contracts to identify additional deliverables provided to customers as part of sales transactions entered into by us. As a result, certain extended warranty revenue recorded in prior periods did not meet the criteria for revenue recognition and should have been deferred and recorded over the contractual period of the extended warranty.*

*Because of the material weakness identified, our management has concluded that our internal control over financial reporting was not effective as of December 31, 2015.*

*Changes in Internal Control over Financial Reporting*

There were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter ended December 31, 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. *However, as noted below, we have implemented changes to our internal control over financial reporting to address the material weakness described above*.

*Remediation*

*We have put a control in place to ensure that proper extended warranty and any other deliverables in our bill of materials are tracked and related revenue deferrals are recorded. The following steps have been implemented:*

- *Initiation of a review of extended warranty and any other deliverables in our bill of materials for all products*
- *Increased oversight and monitoring by our management of extended warranty and other deliverables in our bill of materials for any new products*
- *Documenting and tracking extended warranty and other deliverables in our contract matrix to ensure proper revenue recognition*

Our management believes the foregoing efforts will effectively remediate the material weakness.  As we continue to evaluate and work to improve our internal control over financial reporting, our management may execute additional measures to address the material weakness or modify the remediation plan described and will continue to review and make necessary changes to the overall design of our internal controls.

80.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

81.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased the Company's common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have, or had, a controlling interest.

82.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's common stock was actively traded on NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

83.     Plaintiff's claims are typical of the claims of the members of the Class, since all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law alleged herein.

84.     Plaintiff will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in class action and securities litigation.

85.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts constituted violations of the federal securities laws;

(b)     whether Defendants' statements made to the investing public during the Class Period misrepresented material facts concerning the Company's business, operations, and financial condition;

(c)     whether the price of the Company's common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

86.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  Additionally, there will be no difficulty in the management of this action as a class action.

1

## LOSS CAUSATION

2

87.     During the Class Period, as detailed herein, Defendants engaged in a scheme to

3

deceive the market and a course of conduct that artificially inflated the price of the Company's

4

common stock.  Defendants' conduct, moreover, operated as a fraud or deceit on Class Period

5

purchasers of the Company's common stock by failing to disclose, and misrepresenting, the

6

adverse facts detailed herein.  As Defendants' prior misrepresentations and fraudulent conduct

7

were disclosed and became apparent to the market, the price of the Company's common stock

8

declined significantly as the prior artificial inflation dissipated from the Company's stock price.

9

88.     As a result of the purchases of the Company's common stock during the Class

10

Period, Plaintiff and the other members of the Class suffered economic loss (damages) under the

11

federal securities laws.  Defendants' false and misleading statements had the intended effect, and

12

caused, the Company's common stock to trade at artificially inflated levels throughout the Class

13

Period.

14

89.     By concealing from investors the adverse facts detailed herein, Defendants

15

presented a misleading picture of the Company's business and prospects.  As the truth regarding

16

the Company was revealed to the market, the price of the Company's common stock fell

17

significantly.  These declines removed the inflation from the price of the Company's common

18

stock, causing real economic loss to investors who purchased the Company's common stock

19

during the Class Period.

20

90.     The declines in the price of the Company's common stock after the corrective

21

disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent

22

misrepresentations being revealed to investors and the market.  The timing and magnitude of the

23

price declines in the Company's common stock negate any inference that the loss suffered by

24

25

26

27

28

Plaintiff and the other Class members was caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to defendants' fraudulent conduct.

91.    During the Class Period, the Company's stock price declined as the Company's true financial condition was revealed to the investing public.

92.    The economic loss (damages) suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's common stock and the subsequent significant decline in the value of the Company's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD ON THE MARKET DOCTRINE**

93.    At all relevant times, the market for the Company's common stock was an efficient market for the following reasons, among others:

(a)    The Company's common stock met the requirements for listing, and was listed and actively traded on, NASDAQ, a highly efficient, electronic stock market;

(b)    As a regulated issuer, the Company filed periodic public reports with the SEC;

(c)    The Company regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    The Company was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

94.     As a result of the foregoing, the market for the Company's common stock promptly digested current information concerning the Company from all publicly available sources and reflected such information in the prices of the Company's stock.  Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

### NO SAFE HARBOR

95.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein.  Many of the specific statements alleged herein were not identified as "forward-looking statements" when made, and thus are not entitled to protection under the safe harbor provision.  Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

### COUNT I
### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants

96.     Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

97.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or were deliberately reckless in not knowing, were misleading.  These statements were false and misleading because they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

98.     Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact/and or omitted to state material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

99.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid – or at all – if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

100.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

101.     Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

102.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the

Company's operations and/or intimate knowledge of the Company's statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

103.    The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein.  The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected.  Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

104.    The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

105.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

1        B.      Awarding compensatory damages in favor of Plaintiff and the other Class members

2   against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

3   wrongdoing, in an amount to be proven at trial, including interest thereon;

4        C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

5   this action, including counsel fees and expert fees; and

6        D.      Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: April 1, 2016                 **GLANCY PRONGAY & MURRAY LLP**

By:  *s/ Ex Kano S. Sams II*
Lionel Z. Glancy
Robert V. prongay
Ex Kano S. Sams II
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
Email: lglancy@glancylaw.com
      rprongay@glancylaw.com
      esams@glancylaw.com

*Lead Counsel for Lead Plaintiff and the Class*

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO NORTHERN DISTRICT OF CALIFORNIA LOCAL RULES AND LOCAL CIVIL RULE 5-1**

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court. I am over the age of 18 and not a party to the within action. My business address is 1925 Century Park East, Suite 2100, Los Angeles, California 90067.

On April 1, 2016, I caused to be served the following document:

**CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

By posting the document to the ECF Website of the United States District Court for the Northern District of California, for receipt electronically by the parties as reflected on the attached Court's Service List.

And on any non-ECF registered parties:

By U.S. Mail: By placing true and correct copies thereof in individual sealed envelopes, with postage thereon fully prepaid, which I deposited with my employer for collection and mailing by the United States Postal Service. I am readily familiar with my employer's practice for the collection and processing of correspondence for mailing with the United States Postal Service. In the ordinary course of business, this correspondence would be deposited by my employer with the United States Postal Service that same day.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 1, 2016, at Los Angeles, California.

*s/ Ex Kano S. Sams II*
Ex Kano S. Sams II

327184.1 SUPERMICRO

# Mailing Information for a Case 5:15-cv-04049-EJD Deason v. Super Micro Computer, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **David Allen Priebe**
  david.priebe@dlapiper.com,margaret.austin@dlapiper.com,carmen.manzano@dlapiper.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Ex Kano S. Sams , II**
  esams@glancylaw.com

- **Shirli Fabbri Weiss**
  shirli.weiss@dlapiper.com,emiko.gonzales@dlapiper.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)