Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Ex Kano S. Sams II (#192936)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: lglancy@glancylaw.com
        rprongay@glancylaw.com
        esams@glancylaw.com

*Lead Counsel for Lead Plaintiff and the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DALE DEASON, Individually and On Behalf of All Others Similarly Situated,<br><br>                               Plaintiff,<br><br>v.<br><br>SUPER MICRO COMPUTER, INC., CHARLES LIANG, and HOWARD HIDESHIMA,<br><br>                               Defendants. | Case No. 5:15-cv-04049-EJD<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Andrew Wanca ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Super Micro Computer, Inc. ("Super Micro" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports, accounts of Confidential Witnesses ("CWs") who were former employees of the Company, and other publicly-available information regarding the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons and/or entities who purchased or otherwise acquired the Company's common stock between September 15, 2014 and November 16, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      Defendant Super Micro offers a range of server, storage, blade, workstation, and full-rack equipment systems.   The Company also provides networking devices, server management software, and technology support and services.   Throughout the Class Period, Defendants made materially false and misleading statements and failed to disclose that: (1) Defendants reported false and misleading financial information regarding the Company's operating expenses involving costs related to certain marketing expenses; (2) Defendants improperly recorded revenue related to certain contracts that included extended product warranties as revenue in prior periods – instead of deferring and amortizing such revenue over the contractual periods – resulting in misstatements in the Company's financial statements; and (3) Defendants made false and misleading statements regarding the Company's internal controls.

3.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.    The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

9.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

10.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).   Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

11.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange located in this District.

## PARTIES

12.    Plaintiff Andrew Wanca, as set forth in the certification previously filed in this action which is incorporated by reference herein, purchased the Company's common stock during the Class Period and has been damaged thereby.

13.    Defendant Super Micro is a Delaware corporation with its principal executive offices located at 980 Rock Avenue, San Jose, California 95131.  Super Micro's common stock trades on the NASDAQ under the ticker symbol "SMCI."

14.     Defendant Charles Liang ("Liang") served at all relevant times as the Company's Chief Executive Officer.

15.     Defendant Howard Hideshima ("Hideshima") served at all relevant times as the Company's Chief Financial Officer.

16.     Defendants Super Micro, Liang, and Hideshima are collectively referred to herein as "Defendants."   Defendants Liang and Hideshima are collectively referred to herein as the "Individual Defendants."

17.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of the Company, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects.  Additionally, as set forth more fully below, the Individual Defendants have access to material adverse non-public information concerning the Company.  Because of their positions within the Company, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

18.     The Individual Defendants are liable as direct participants in the wrongs alleged herein.   In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful

conduct alleged.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

19.     The Individual Defendants, because of their positions within the Company, controlled and/or possessed the authority to control the contents of the Company's reports, press releases, and presentations to securities analysts and, through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged to be misleading herein, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

20.     The Individual Defendants, as senior executive officers and/or directors – and as controlling persons of a publicly-traded company whose common stock was, and is, governed by the federal securities law – had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

21.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud and/or deceit on purchasers of the Company's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  This scheme: (1) deceived the investing public regarding the Company's business, operations and management, and the intrinsic value of the Company's common stock; (2) enabled the Company to obtain additional capital at favorable prices, create a public market for its

common stock, and gain access to the public equity markets; and (3) caused Plaintiff and members of the Class to purchase the Company's common stock at artificially inflated prices.

## BACKGROUND

22.     Defendant Super Micro develops and provides high-performance server solutions based on modular and open-standard architecture.  The Company offers a range of server, storage, blade, workstation, and full rack solutions, as well as networking devices, server management software, and technology support and services.  The Company also provides a range of application optimized server solutions, including rackmount and blade server systems; and server subsystems and accessories comprising server boards, and chassis and power supplies, as well as other system accessories, including microprocessors, and memory and disc drives.  Super Micro offers its products to data center, cloud computing, enterprise IT, big data, high performance computing, and embedded markets.

23.     The Company was founded in 1993 and is incorporated in Delaware, with headquarters in San Jose, California.  The Company's shares trade on the NASDAQ exchange under the ticker symbol "SMCI."

## MATERIALLY FALSE AND MISLEADING STATEMENTS

24.     The Class Period begins on September 15, 2014, when Super Micro filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal quarter and year ended June 30, 2014 (the "2014 10-K").  The 2014 10-K described the Company's sales and marketing expenses as follows:

> Sales and marketing expenses.  Sales and marketing expenses consist primarily of salaries and incentive bonuses for our sales and marketing personnel, costs for tradeshows, independent sales representative fees and marketing programs.  From time to time, we receive cooperative marketing funding from certain suppliers. Under these programs, we are reimbursed for certain marketing costs that we incur as part of the joint promotion of our products and those of our suppliers. These amounts offset a portion of the related expenses and have the effect of reducing our reported sales and marketing expenses.  Similarly, we from time to

time offer our distributors cooperative marketing funding which has the effect of increasing our expenses. The timing, magnitude and estimated usage of our programs and those of our suppliers can result in significant variations in reported sales and marketing expenses from period to period. Spending on cooperative marketing, either by us or our suppliers, typically increases in connection with significant product releases by us or our suppliers.

25. The 2014 10-K described the Company's product warranties as follows:

*Product warranties*. We offer product warranties ranging from 15 to 39 months against any defective product. We accrue for estimated returns of defective products at the time revenue is recognized, based on historical warranty experience and recent trends. We monitor warranty obligations and may make revisions to our warranty reserve if actual costs of product repair and replacement are significantly higher or lower than estimated. Accruals for anticipated future warranty costs are charged to cost of sales and included in accrued liabilities.

26. The 2014 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting. Specifically, the Individual Defendants represented:

I, [Charles Liang and Howard Hideshima], certify that:

1. I have reviewed this annual report on Form 10-K of Super Micro Computer, Inc.;

2. ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3. ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   ***The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):***

a.   ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

b.   ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***

27.   Defendants' SOX certifications were false and misleading because on November 16, 2015, the Company filed a Form 8-K/A admitting that a material weakness existed in the Company's internal control over financial reporting related to the revenue recognition of contracts with extended product warranties:

[T]he Company has determined that for certain contracts which included extended product warranties, revenue relating to the extended warranties was recorded as revenue in prior periods instead of being deferred and amortized over the contractual period.

* * *

*[T]he Company's management has determined, and the Audit Committee of its Board of Directors has concurred, that a material weakness existed in the Company's internal control over financial reporting related to the revenue recognition of contracts with extended product warranties.*

28.      On November 6, 2014, Super Micro filed a quarterly report on Form 10-Q with the SEC reiterating the financial and operating results previously announced in the Q1 2015 8-K (the "Q1 2015 10-Q").  The Q1 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting:

I, [Charles Liang and Howard Hideshima], certify that:

1.      I have reviewed this annual report on Form 10-K of Super Micro Computer, Inc.;

2.      *Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;

3.      *Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report*;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our

supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

d.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    *The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):*

a.    *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

b.    *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting*.

29.    Defendants' SOX certifications were false and misleading because on November 16, 2015, the Company filed a Form 8-K/A admitting that a material weakness existed in the Company's internal control over financial reporting related to the revenue recognition of contracts with extended product warranties:

[T]he Company has determined that for certain contracts which included extended product warranties, revenue relating to the extended warranties was recorded as revenue in prior periods instead of being deferred and amortized over the contractual period.

\* \* \*

***[T]he Company's management has determined, and the Audit Committee of its Board of Directors has concurred, that a material weakness existed in the Company's internal control over financial reporting related to the revenue recognition of contracts with extended product warranties.***

30.     On February 9, 2015, Super Micro filed a quarterly report on Form 10-Q with the SEC reiterating the financial and operating results previously announced in the Q2 2015 8-K (the "Q2 2015 10-Q"). The Q2 2015 10-Q also contained signed certifications pursuant to SOX by the Individual Defendants stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting:

I, [Charles Liang and Howard Hideshima], certify that:

1.     I have reviewed this annual report on Form 10-K of Super Micro Computer, Inc.;

2.     ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3.     ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our

supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   *The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):*

a.   *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

b.   *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting*.

31.   Defendants' SOX certifications were false and misleading because on November 16, 2015, the Company filed a Form 8-K/A admitting that a material weakness existed in the Company's internal control over financial reporting related to the revenue recognition of contracts with extended product warranties:

[T]he Company has determined that for certain contracts which included extended product warranties, revenue relating to the extended warranties was recorded as revenue in prior periods instead of being deferred and amortized over the contractual period.

* * *

***[T]he Company's management has determined, and the Audit Committee of its Board of Directors has concurred, that a material weakness existed in the Company's internal control over financial reporting related to the revenue recognition of contracts with extended product warranties.***

32.     On May 7, 2015, Super Micro filed a quarterly report on Form 10-Q with the SEC reiterating the financial and operating results previously announced in the Q3 2015 8-K (the "Q3 2015 10-Q"). The Q3 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting:

I, [Charles Liang and Howard Hideshima], certify that:

1.     I have reviewed this annual report on Form 10-K of Super Micro Computer, Inc.;

2.     ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3.     ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a.     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our

supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   *The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):*

a.   *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

b.   *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting*.

33.   Defendants' SOX certifications were false and misleading because on November 16, 2015, the Company filed a Form 8-K/A admitting that a material weakness existed in the Company's internal control over financial reporting related to the revenue recognition of contracts with extended product warranties:

[T]he Company has determined that for certain contracts which included extended product warranties, revenue relating to the extended warranties was recorded as revenue in prior periods instead of being deferred and amortized over the contractual period.

\* \* \*

*[T]he Company's management has determined, and the Audit Committee of its Board of Directors has concurred, that a material weakness existed in the Company's internal control over financial reporting related to the revenue recognition of contracts with extended product warranties.*

34.     On August 4, 2015, Super Micro issued a press release announcing the Company's financial results for fourth quarter and full year of 2015.  Within the press release, the Company stated the following:

Super Micro Computer, Inc. (NASDAQ:SMCI), a global leader in high-performance, high-efficiency server, storage technology and green computing, today announced fourth quarter and full-year financial results for the fiscal year ended June 30, 2015.

Fiscal 4th Quarter Highlights

•     *Quarterly net sales of $573.6 million, up 21.7% from the third quarter of fiscal year 2015 and up 34.0% from the same quarter of last year.*
•     *GAAP net income of $26.7 million, up 15.8% from the third quarter of fiscal year 2015 and up 61.4% from the same quarter of last year*.
•     GAAP gross margin of 15.6%, down from 16.3% in the third quarter of fiscal year 2015 and up from 15.5% in the same quarter of last year.
•     Server solutions accounted for 61.7% of net sales compared with 64.1% in the third quarter of fiscal year 2015 and 55.2% in the same quarter of last year.

*Net sales for the fourth quarter ended June 30, 2015 totaled $573.6 million, up 21.7% from $471.2 million in the third quarter of fiscal year 2015.* No customer accounted for more than 10% of net sales during the quarter ended June 30, 2015.

*GAAP net income for the fourth quarter of fiscal year 2015 was $26.7 million or $0.51 per diluted share, an increase of 61.4% from net income of $16.5 million, or $0.34 per diluted share in the same period a year ago*.  Included in net income for the quarter is $4.0 million of stock-based compensation expense (pre-tax). Excluding this item and the related tax effect, *non-GAAP net income for the fourth quarter was $30.0 million, or $0.57 per diluted share, compared to non-GAAP net income of $19.4 million, or $0.40 per diluted share, in the same quarter of the prior year. On a sequential basis, non-GAAP net income increased from the third quarter of fiscal year 2015 by $5.1 million or $0.10 per diluted share*.

* * *

Fiscal Year 2015 Summary

*Net sales for the fiscal year ended June 30, 2015 were $1,991.2 million, up 35.7% from $1,467.2 million for the fiscal year ended June 30, 2014. GAAP net income for fiscal year 2015 increased to $101.9 million, or $2.03 per diluted share, an increase of 88.1% from $54.2 million, or $1.16 per diluted share, for fiscal year 2014.* Excluding $9.7 million of stock based-compensation expense and related tax effect, *non-GAAP net income for the fiscal year 2015 was $111.6 million or $2.15 per diluted share, an increase of 77.4% compared to $62.9 million or $1.34 per diluted share for fiscal year 2014.*

Business Outlook & Management Commentary

*The Company expects net sales of $520 million to $580 million for the first quarter of fiscal year 2016 ending September 30, 2015. The Company expects non-GAAP earnings per diluted share of approximately $0.49 to $0.59 for the first quarter.*

"*Supermicro delivered record revenues in the fourth quarter of 34% growth over last year and posting $1.99 billion for the full fiscal year 2015 which was 35.7% above last year. Revenue related to our storage solutions grew 79% year over year in the fourth quarter as storage has become a strategic growth segment with contributions from both traditional and next generation storage solutions*. Our FatTwin solutions were also a key growth driver this quarter with over 100% growth year over year and sales of our new MicroBlade solutions grew strongly for a new product category," said Charles Liang, Chairman and CEO. "Looking to 2016 we have never been stronger in terms of leading products like Ultra, GPU/Xeon Phi, Storage, MicroBlade, and our software and service offerings. In order to support our growth, we are in the process of completing a 30% capacity addition in our San Jose and Europe manufacturing operations. We believe that we are well positioned for continued growth and market share gains."

35.     These statements were false and misleading because on November 16, 2015, the Company filed a Form 8-K/A admitting that "the Company has determined that for certain contracts which included extended product warranties, revenue relating to the extended warranties was recorded as revenue in prior periods instead of being deferred and amortized over the contractual period" and that "*the cumulative impact on revenue that should have been deferred for the applicable contracts for the three prior fiscal period ended June 30, 2015 was $9.3 million . . . .*" Additionally, within the Company's Form 8-K filed on October 8, 2015, Super

Micro stated that it "anticipates that it will report revenue for its first quarter of fiscal 2016 in the range of $529 million to $530 million. This compares to the company's previous guidance range of $520 million to $580 million." Super Micro's Form 10-Q filed on November 16, 2015 also provided the following:

> *In November 2015, the Company identified errors related to revenue which was recognized prior to meeting US GAAP revenue recognition criteria which impacted fiscal years 2013, 2014 and 2015.* The Company determined that certain contracts for extended warranties on products were recorded as revenue at the time of sale of the product in prior periods instead of being deferred and amortized over the contractual warranty period. *The cumulative impact of this error pertaining to prior periods through June 30, 2015 was to overstate net sales and net income by $9,259,000 and $5,926,000, respectively.*

36.   On August 4, 2015, Super Micro also held a conference call to discuss the Company's financial results for the fourth quarter of 2015.   During the conference call, Defendants represented the following:

> HOWARD HIDESHIMA: Our [operating] expenses were higher on an absolute dollar basis year over year, primarily in R&D, as we invested in personnel expenses to support the development of our total solution. *Sequentially, operating expenses were higher due to higher prototype and testing fees of approximately $1.4 million, and higher marketing and promotion costs of $0.9 million to support the development and promotion of new products.*

37.   These statements were false and misleading because Defendants made no reference to the Company's "irregularities regarding certain marketing expenses" that the Company announced within its August 31, 2015 Notification.

38.   On August 31, 2015, Super Micro filed a Notification of Late Filing with respect to the Company's Form 10-K for the fiscal year ended June 30, 2015.   Within the Notification, the Company stated the following:

> Super Micro Computer, Inc. (the "Registrant") has determined that it is unable to file its Annual Report on Form 10-K for the fiscal year ended June 30, 2015 (the "Form 10-K") within the prescribed time period without unreasonable effort or expense. *The Registrant recently discovered certain irregularities regarding certain marketing expenses and additional time is required for the Registrant to complete its investigation of the matter.*

39.     On September 10, 2015, Super Micro filed its Form 10-K for the fiscal year ended June 30, 2015 ("2015 10-K").  The 2015 10-K made no reference to "irregularities regarding certain marketing expenses" that the Company announced within its August 31, 2015 Notification, and made no changes to the Company's financial statements presented within the Company's August 4, 2015 press release.  Accordingly, Super Micro's Form 10-K was false and misleading because it contained material omissions regarding the Company's "irregularities regarding certain marketing expenses" that significantly impacted the Company's stock price on August 31, 2015 and October 9, 2015, when the Company subsequently disclosed certain information regarding the impact of such "irregularities."

40.     The 2015 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.  Specifically, the Individual Defendants represented:

I, [Charles Liang and Howard Hideshima], certify that:

1.     I have reviewed this annual report on Form 10-K of Super Micro Computer, Inc.;

2.     ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3.     ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   *The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):*

a.   *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

b.   *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.*

41.   Defendants' SOX certifications were false and misleading because on November 18, 2015, Super Micro filed a Form 10-K/A admitting that a material weakness existed in the Company's internal control over financial reporting related to the revenue recognition of contracts with extended product warranties:

Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) and 15d-15(e) promulgated under the Exchange Act. The evaluation considered the procedures designed to ensure that information required to be disclosed by us in the reports filed or submitted by us under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms and is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. Based on that evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective at a reasonable assurance level as of June 30, 2015. *However, due to the material weakness in internal control over financial reporting described below, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were not effective, and were not operating at the reasonable assurance level as of June 30, 2015*.

* * *

*Based on the reassessment of the deficiency in the design of our revenue internal controls, we have determined that a material weakness existed in our internal control over financial reporting as of June 30, 2015*. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of a company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis. *Our management has identified a deficiency in the design of a control that represents a material weakness in internal control over financial reporting as follows:*

*We did not have a control in place that is designed to review underlying sales contracts for certain extended warranty to identify additional deliverables provided to customers as a part of sales transactions entered into by us. As a result, certain extended warranty revenue recorded in prior periods did not meet the criteria for revenue recognition and should have been deferred and recorded over the contractual period of the extended warranty*.

42.     Defendants' SOX certifications were also false and misleading because on November 16, 2015, the Company filed a Form 8-K/A admitting that a material weakness existed in the Company's internal control over financial reporting related to the revenue recognition of contracts with extended product warranties:

On October 22, 2015, Super Micro Computer, Inc. issued a press release announcing its operating and financial results for the first quarter of fiscal year 2016 (the "October Press Release"). In connection with the completion of the

Company's quarter-end closing and review procedures and the preparation of its Quarterly Report on Form 10-Q for the quarter ended September 30, 2015 (the "Form 10-Q"), ***the Company has determined that for certain contracts which included extended product warranties, revenue relating to the extended warranties was recorded as revenue in prior periods instead of being deferred and amortized over the contractual period***.

***The Company has determined the cumulative impact on revenue that should have been deferred for the applicable contracts for the three prior fiscal year period ended June 30, 2015 was $9.3 million and for the quarter ended September 30, 2015 was $1.3 million. As a result, the condensed consolidated statement of operations and condensed consolidated balance sheet included in the Company's Form 10-Q reflect aggregate net sales for the quarter ended September 30, 2015 of $519.6 million, $10.6 million less than reflected in the October Press Release***. This deferred revenue will be recognized through January 2019. ***The reduction in net sales also resulted in a reduction in GAAP net income of $6.8 million, or $0.13 per diluted share, from $20.5 million reported in the October Press Release to $13.7 million in the Form 10-Q.  GAAP net income of $0.8 million or $0.02 per diluted share was related to the quarter ended September 30, 2015***. The information contained herein and in the Form 10-Q supersedes and replaces any conflicting information in the October Press Release. ***The flow through impact of the change also resulted in certain changes to other income statement and balance sheet line items, all as reflected in the Form 10-Q***.

***As a result of the adjustments described above, the Company's management has determined, and the Audit Committee of its Board of Directors has concurred, that a material weakness existed in the Company's internal control over financial reporting related to the revenue recognition of contracts with extended product warranties.  A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.  As a result of this determination that the controls relating to revenue from certain contracts with extended product warranties, as designed and in place, did not operate effectively as of September 30, 2015, the Company has taken steps to remediate this deficiency***.

43.     Also within Super Micro's Form 10-K issued on September 10, 2015, Defendants considered accounting for "warranty obligation" as a "critical accounting policy."  For instance, within the Super Micro's Form 10-K, the Company stated the following:

***Critical Accounting Policies***

Our discussion and analysis of our financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States.  The

preparation of these financial statements requires us to make estimates and judgments that affect the reported amount of assets, liabilities, revenues and expenses. *We evaluate our estimates on an on-going basis, including those related to allowances for doubtful accounts and sales returns, inventory valuations, income taxes, warranty obligations, stock-based compensation and impairment of short-term and long-term investments*. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances, the results of which form the basis for making the judgments we make about the carrying values of assets and liabilities that are not readily apparent from other sources. Because these estimates can vary depending on the situation, actual results may differ from the estimates.

*We believe the following are our most critical accounting policies as they require our more significant judgments in the preparation of our financial statements.*

* * *

*Product warranties.* We offer product warranties ranging from 15 to 39 months against any defective product. We accrue for estimated returns of defective products at the time revenue is recognized, based on historical warranty experience and recent trends. *We monitor warranty obligations and may make revisions to our warranty reserve if actual costs of product repair and replacement are significantly higher or lower than estimated. Accruals for anticipated future warranty costs are charged to cost of sales and included in accrued liabilities. The liability for product warranties was $7.7 million as of June 30, 2015, compared with $7.1 million as of June 30, 2014. The provision for warranty reserve was $15.8 million, $14.2 million and $13.4 million in fiscal years 2015, 2014 and 2013, respectively. Our estimates and assumptions used have been historically close to actual. The change in estimated liability for pre-existing warranties was ($0.2) million, $0.4 million and ($1,000) in fiscal years 2015, 2014 and 2013, respectively. As a result of our increase in cost of servicing warranty claims from our increase in net sales in fiscal year 2015 and 2014, the provision for warranty reserve increased $1.6 million and $0.7 million in fiscal year 2015 and 2014, respectively.*

44.     These statements were false and misleading because the Company's restatement does not correct expense for warranty. Indeed, since the term "extended warranty" does not exist within the Form 10-K filed on September 10, 2015 – the "extended warranty" of the Company's Form 10-K/A was apparently beyond the warranty obligation described in Super Micro's Form 10-K. Indeed, the following language in the Company's Form 10-K filed on September 10, 2015 apparently refers to "extended-warranty:"

"The Company has an immaterial amount of service revenue relating to on-site service and non-warranty repairs. **Revenue for on-site service is recognized over the contracted service period**, and revenue for non-warranty repair service is recognized upon shipment of the repaired units to customers. **Service revenue has been less than 10% of net sales for all periods presented and is not separately disclosed**."

45.     On August 31, 2015, post-market, Super Micro announced that the Company "has determined that it is unable to file its Annual Report on Form 10-K for the fiscal year ended June 30, 2015 within the prescribed time period without unreasonable effort or expense. [Super Micro] recently discovered certain irregularities regarding certain marketing expenses and additional time is required for [the Company] to complete its investigation of the matter."

46.     On the same date, the Company filed a Notification of Late Filing with the SEC with respect to the Company's Form 10-K.  Within the Notification, Super Micro stated that "[t]he Registrant recently discovered certain irregularities regarding certain marketing expenses and additional time is required for the Registrant to complete its investigation of the matter."

47.     On this news, shares of Super Micro Computer declined $2.58 per share, or 9.4%, to close at $24.77 on September 1, 2015.

48.     On October 8, 2015, Super Micro filed a Form 8-K with the SEC in which the Company preannounced a shortfall in revenue relative to the guidance that the Company provided on August 4, 2015.  Among other things, the Company stated:

> **The company now anticipates that it will report revenue for its first quarter of fiscal 2016 in the range of $529 million to $530 million. This compares to the company's previous guidance range of $520 million to $580 million**.
>
> **Non-GAAP gross margin is expected to be approximately 15.6% to 15.7%.**
>
> **The company anticipates that it will report non-GAAP operating expenses for first fiscal quarter between $2.0 million and $3.0 million higher than the fourth fiscal quarter of 2015.** The increase in expenses was primarily due to higher compensation expenses and headcount increases to support new technologies **and higher legal and other expenses associated with our previously disclosed review of certain marketing expenses.**

49.     Also on October 8, 2015, the Company issued revenue and profit warnings for the first quarter of 2016.  The Company's press release admitted:

*"The company anticipates that it will report non-GAAP operating expenses for first fiscal quarter between $2.0 million and $3.0 million higher than the fourth fiscal quarter of 2015*. The increase in expenses was primarily due to higher compensation expenses and headcount increases to support new technologies and higher legal *and other expenses associated with our previously disclosed review of certain marketing expenses."*

50.     On this news, the price of the Company's stock dropped 15.5%.

51.     On October 22, 2015, Super Micro held an earnings conference call to discuss the Company's financial results for the first quarter of 2016.  During the conference call, Defendants represented the following:

HOWARD HIDESHIMA:  Operating expenses were $47.1 million, up from $34.8 million in the same quarter a year ago and up from $45.3 million sequentially. As a percentage of revenue, operating expenses was 8.9%, which is up from 7.9% in the same quarter a year ago and up from 7.9% sequentially. Operating expenses were higher on an absolute dollar basis year-over-year, primarily in personnel expenses to support the development of our total solution and the lack of a $1.9 million R&D VAT tax credit from Taiwan which occurred last year. *Sequentially, operating expenses were higher due to* higher personnel expenses of $4.1 million due to annual salary adjustments *and $1.4 million of higher legal and accounting expenses primarily related to the investigation of marketing expenses* offset in part by a higher foreign exchange gain of $1.8 million.

* * *

AARON RAKERS: Thanks. I have to follow up as well. So, a couple of quick questions. *So, first of all, I'm just curious of what, with the variables involved in the operating expense line, I think it was a $1.4 million impact from the marketing examination this last quarter, what are you assuming on the operating expense line this quarter, and how should we model that over the next couple of quarters?*

HOWARD HIDESHIMA: I think we went through our annual salary increase. *So if you start off as a baseline there, you take off some of the unusual expense let's say for the investigation that we got into the marketing expense, you take that off per se there, and then air out some of the foreign exchange gain, then you get to a baseline where we start at about $47 million this quarter*. I think if you start down at the baseline and look from there going up little bit, I think that's a fair baseline.

AARON RAKERS: So $47 million this quarter is kind of the right number to be thinking about.

HOWARD HIDESHIMA: In the September quarter, that's where we ended up. And so up from there a bit.

52.     The guidance that Defendants provided on August 4, 2015 was overly optimistic because Defendants were aware of – or deliberately reckless in not knowing – of the Company's practice of channel staffing and the existence of deteriorating Days Sales Outstanding ("DSO") and inventory days.   Indeed, in a report dated August 4, 2015, a Super Micro analyst – Susquehanna Financial Group, LLP ("Susquehanna") stated that "[o]n the call, SMCI stated that Subsystem distributor demand was strong, particularly in the U.S., which could suggest. . . distributor inventory build."   On the contrary, the Company's subsystems sales actually sank in the first quarter of 2016:

| | | | | | Oct-22 Release |
|---|---|---|---|---|---|
| As reported | Q1-15 | Q2-15 | Q3-15 | Q4-15 | Q1-16 |
| Server systems | 255,609 | 302,256 | 301,953 | 353,790 | 366,923 |
| Subsystems and accessories | 187,713 | 200,758 | 169,272 | 219,804 | 163,312 |
| | 443,322 | 503,014 | 471,225 | 573,594 | 530,235 |

53.     Indeed, in a subsequent Susquehanna report on October 8, 2015, Susquehanna stated that "[w]e believe management was **overly aggressive** with guidance in the face of macro/industry uncertainty and annual revenue cadence . . . ."

54.     The Company's relatively high ratios, moreover, are consistent with channel stuffing:

///

///

///

|  | 2014 | 2014 |  |  | 2015 | 2015 |
|---|---|---|---|---|---|---|
|  | March | June |  |  | March | June |
| sales | 373,755 | 428,069 |  |  | 471,225 | 573,594 |
| cost of sales | 316,491 | 361,672 |  |  | 394,405 | 483,828 |
|  |  |  |  |  |  |  |
| EOP A/R | 101,714 | 212,738 |  |  | 221,561 | 322,594 |
| EOP inventory | 182,028 | 315,837 |  |  | 430,382 | 463,493 |
|  |  |  |  |  |  |  |
| DSO | 24.5 | 44.7 |  |  | 42.3 | 50.6 |
| Inventory days | 51.8 | 78.6 |  |  | 98.2 | 86.2 |

55.     Analysts, moreover, discussed these issues.  For example, in an August 5, 2015 Company Note, Roth Capital Partners, LLC ("Roth") noted that the Company's "[c]ash declined $13.8 million in the quarter due to the combination of increasing receivables . . . ."

56.     Additionally, on November 11, 2015, Susquehanna issued a report that classified the Company's "irregularities regarding certain marketing expenses" and the extended warranty Generally Accepted Accounting Principles ("GAAP") violation in the same basket of internal control deficiencies.  As a result, the Company's price declines of August 31, 2015, October 9, 2015, and November 10, 2015 were part of the same contextual timeline:

> "This delay follows a series of disappointing events from earlier this year; from port delays (and thus impacting shipment to customers), to *recognition of marketing expenses* in the recent late 10-K filing, and now the *recognition of warranties*."

> "We remind investors that SMCI required an extension for its 10-K as well. Back on 8/31, SMCI requested an extension to file its 10-K due to an internal review of certain marketing expenses. It is unclear to us whether the issues experienced with the late 10-K filing are related at all to the late 10-Q filing (likely not), however, we believe the 2 incidents are hampering SMCI's ability to instill positive investor sentiment in the stock."

57.     On October 8, 2015, the Company filed a Form 8-K with the SEC.  Within the Form 8-K, Super Micro stated the following:

> *The company now anticipates that it will report revenue for its first quarter of fiscal 2016 in the range of $529 million to $530 million. This compares to the company's previous guidance range of $520 million to $580 million.*

Non-GAAP gross margin is expected to be approximately 15.6% to 15.7%.

*The company anticipates that it will report non-GAAP operating expenses for first fiscal quarter between $2.0 million and $3.0 million higher than the fourth fiscal quarter of 2015. The increase in expenses was primarily due to higher compensation expenses and headcount increases to support new technologies and higher legal and other expenses associated with our previously disclosed review of certain marketing expenses.*

*The company also anticipates that its non-GAAP earnings per share will be in a range of $0.44 to $0.45. This compares to the company's previous guidance of $0.49 to $0.59.*

The company ended the first quarter of fiscal 2016 with approximately $113.6 million in cash and cash equivalents, and short and long term investments compared to $98.1 million at the end of fourth quarter of fiscal 2015.

58.     On this news, the Company's stock price dropped $4.92 per share, or 15.5%, to close on October 9, 2015 at $26.90 per share.

59.     On October 22, 2015 – after the close of the market – Super Micro issued a Form 8-K with the earnings release.  Within the Form 8-K, the Company stated the following:

Fiscal 1st Quarter Highlights

•     *Quarterly net sales of $530.2 million, down 7.6% from the fourth quarter of fiscal year 2015 and up 19.6% from the same quarter of last year*.

•     *GAAP net income of $20.5 million, down 23.2% from the fourth quarter of fiscal year 2015 and down 1.8% from the same quarter of last year*.

•     GAAP gross margin was 15.6% in the first quarter of fiscal year 2016, the fourth quarter of fiscal year 2015 and the same quarter of last year.

•     Server solutions accounted for 69.2% of net sales compared with 61.7% in the fourth quarter of fiscal year 2015 and 57.7% in the same quarter of last year.

*Net sales for the first quarter ended September 30, 2015 totaled $530.2 million, down 7.6% from $573.6 million in the fourth quarter of fiscal year 2015. One customer accounted for 11.9% of net sales during the quarter ended September 30, 2015*.

*GAAP net income for the first quarter of fiscal year 2016 was $20.5 million or $0.40 per diluted share, a decrease of 1.8% from net income of $20.9 million, or $0.42 per diluted share in the same period a year ago*.  Included in net income for

the quarter is $3.9 million of stock-based compensation expense (pre-tax). Excluding this item and the related tax effect, non-GAAP net income for the first quarter was $23.4 million, or $0.45 per diluted share, compared to non-GAAP net income of $23.2 million, or $0.46 per diluted share, in the same quarter of the prior year. On a sequential basis, non-GAAP net income decreased from the fourth quarter of fiscal year 2015 by $6.6 million or $0.12 per diluted share.

GAAP gross margin was 15.6% for the first quarter of fiscal year 2016, the fourth quarter of fiscal year 2015 and the same period a year ago. Non-GAAP gross margin was 15.7% for the first quarter of fiscal year 2016, the fourth quarter of fiscal year 2015 and the same period a year ago.

The GAAP income tax provision was $11.3 million or 35.6% of income before tax provision compared to $10.6 million or 33.7% in the same period a year ago and $13.8 million or 34.1% in the fourth quarter of fiscal year 2015.

The Company's cash and cash equivalents and short and long term investments at September 30, 2015 were $113.6 million compared to $98.1 million at June 30, 2015. Free cash flow for the three months ended September 30, 2015 was $12.6 million, primarily due to an increase in the Company's cash provided by operating activities and partially offset by the cash used in the development and construction of improvements on the Company's property.

Business Outlook & Management Commentary

The Company expects net sales of $580 million to $630 million for the second quarter of fiscal year 2016 ending December 31, 2015. The Company expects non-GAAP earnings per diluted share of approximately $0.54 to $0.64 for the second quarter.

"As previously disclosed, first quarter revenue was lower than expected due to stronger seasonal effects combined with customer push outs and weaker European and Asia business activity. Nonetheless, with 19.6% growth in a seasonally weak quarter, we are off to a strong start to fiscal 2016. Our growth strategy for 2016 will be to continue to introduce new technologies such as NVMe and all flash storage array to evolve and grow key business verticals in Storage, Cloud/Internet Datacenter, HPC, Embedded and Enterprise," said Charles Liang, Chairman and Chief Executive Officer. "With our system management software, onsite service and system solution capacity are fully ready for the worldwide market, we expect to continue our strong growth with over 20% revenue growth for fiscal 2016".

60.     The Company's Form 8-K filed on October 22, 2015 also provided the following information:

| | | | Q1-16 | GAAP | Adj. | NonGAAP | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Net sales | 530,235 | | **530,235** | above Oct-8 guide | | |
| | | | Cost of sales | 447,403 | 240 | 447,163 | | | |
| | | | Gross profit | 82,832 | | 83,072 | | | |
| | | | | 15.6% | | **15.7%** | highr end of Oct-8 guide | | |
| | | | | | | | | | |
| | | INCOME FROM OPERATIONS | | 32,057 | 3,876 | 35,933 | | | |
| | Non-GAAP  Operating Margin | | | (in slide 10) | | **6.8%** | | | |
| | | | | | | | | | |
| | | | NET INCOME | 20,494 | 2,928 | 23,422 | | | |
| | | Diluted - Non-GAAP #shares | | | | 52,042 | | | |
| Non-GAAP NET INCOME PER COMMON SHARE – DILUTED | | | | | | **0.45** | highr end of Oct-8 guide | | |

61.     On this news, the Company's stock price jumped 12% on October 23, 2015.

62.     The statements contained within the Company's Form 8-K issued on October 22, 2015 were false and misleading because, as the Company later admitted, Defendants improperly recognized sales in violation of GAAP.  Indeed, within the Company's Form 8-K/A filed on November 16, 2015 (as described more fully below), the Company admitted that the sales information reported in the original Form 8-K for "quarter ended September 30, 2015 was [overstated by] $1.3 million."  As a result, the condensed consolidated statement of operations and condensed consolidated balance sheet included in the Company's Form 10-Q filed on November 16, 2015 reflected aggregate net sales for the quarter ended September 30, 2015 of $519.6 million, *$10.6 million less than reflected in the Company's October 22, 2015 press release*.  *The reduction in net sales also resulted in a reduction in GAAP net income of $6.8 million, or $0.13 per diluted share, from $20.5 million reported in the Company's October 22, 2015 press release to $13.7 million in the Form 10-Q filed on November 16, 2015*.

63.     On November 10, 2015 – after the close of the market – Super Micro issued a Form NT 10-Q – Notification of Late Filing with the SEC.  Within the Form NT 10-Q, the Company stated the following: *"[t]he Company has determined that certain contracts for product extended*

1    ***warranties were recorded as revenue in prior periods instead of being deferred and amortized***

2    ***over the contractual period.***"   On this news, the Company's stock price declined $3.07 per share,

3    or 10.5%, to close at $26.18 per share on November 11, 2015.  The Company's Form NT 10-Q

4    issued on November 10, 2015 contained no quantitative information and therefore represented a

5    partial corrective disclosure.

6

7    64.    On November 11, 2015, Susquehanna issued a report entitled "SuperMicro: Been a

8    Rough Year, But Will It Get Worse?  Prefer to Move to Sidelines, For Now."  Within the report,

9    Susquehanna stated the following:

10
> After the close yesterday, SMCI announced that it will not be able to file its 10-Q
> in time with its deadline.  SMCI stated that it has experienced delays in obtaining
11   > information regarding certain contracts for product extended warranties that were
> recognized as revenue initially, rather than being classified as deferred revenue and
12   > amortized over the life of the contract.  Moreover, SMCI stated that they do not
> expect the changes to be material to prior reported financials, and anticipate filing
13   > the 10-Q within the 5 additional days beyond initial due date.  ***Nonetheless, this***
> ***delay follows a series of disappointing events from earlier this year; from port***
14   > ***delays (and thus impacting shipment to customers), to recognition of marketing***
> ***expenses in the recent late 10-K filing, and now the recognition of warranties.***
15   > ***All in all, we believe some of the disappointing events YTD are more reflective of***
> ***a high growth company that has not implemented the necessary infrastructure to***
16   > ***monitor internal processes.  For instance, the management team still expects to***
> ***hit a revenue target of $3B in FY17, but can not communicate how the different***
17   > ***pieces of revenue mix will evolve to hit such targets.  We find it prudent to***
> ***downgrade to Neutral and move to the sidelines until we gain confidence that the***
18   > ***company will solidify its internal operations***.

19
65.    The November 11, 2015 Susquehanna report also stated that Super Micro's request
20
for an extension on August 31, 2015 to file its Form 10-K because of an internal review of the
21
Company's marketing expenses, along with the Company's request for an extension for certain
22
contracts for warranties that Super Micro recorded as revenue, "are hampering SMCI's ability to
23
instill positive investor sentiment in the stock."
24

25
66.    On November 16, 2015, the Company filed its Form 10-Q for the quarterly period
26
ended September 30, 2015.  On the same day, the Company also filed a Form 10-K/A.  Super
27

28

Micro's filings with the SEC corrected the Company's statements on internal controls.   The

Company also filed a Form 8-K/A that amended Super Micro's Form 8-K filed on October 22,

2015.   Within the Form 8-K/A, the Company stated the following:

> On October 22, 2015, Super Micro Computer, Inc. issued a press release announcing its operating and financial results for the first quarter of fiscal year 2016 (the "October Press Release"). In connection with the completion of the Company's quarter-end closing and review procedures and the preparation of its Quarterly Report on Form 10-Q for the quarter ended September 30, 2015 (the "Form 10-Q"), *the Company has determined that for certain contracts which included extended product warranties, revenue relating to the extended warranties was recorded as revenue in prior periods instead of being deferred and amortized over the contractual period*.
>
> *The Company has determined the cumulative impact on revenue that should have been deferred for the applicable contracts for the three prior fiscal year period ended June 30, 2015 was $9.3 million and for the quarter ended September 30, 2015 was $1.3 million*. As a result, the condensed consolidated statement of operations and condensed consolidated balance sheet included in the Company's Form 10-Q reflect aggregate net sales for the quarter ended September 30, 2015 of $519.6 million, $10.6 million less than reflected in the October Press Release*. This deferred revenue will be recognized through January 2019. *The reduction in net sales also resulted in a reduction in GAAP net income of $6.8 million, or $0.13 per diluted share, from $20.5 million reported in the October Press Release to $13.7 million in the Form 10-Q. GAAP net income of $0.8 million or $0.02 per diluted share was related to the quarter ended September 30, 2015*. The information contained herein and in the Form 10-Q supersedes and replaces any conflicting information in the October Press Release. *The flow through impact of the change also resulted in certain changes to other income statement and balance sheet line items, all as reflected in the Form 10-Q*.
>
> *As a result of the adjustments described above, the Company's management has determined, and the Audit Committee of its Board of Directors has concurred, that a material weakness existed in the Company's internal control over financial reporting related to the revenue recognition of contracts with extended product warranties.   A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.   As a result of this determination that the controls relating to revenue from certain contracts with extended product warranties, as designed and in place, did not operate effectively as of September 30, 2015, the Company has taken steps to remediate this deficiency*.

67.     Because Defendants admitted the condensed consolidated statement of operations and condensed consolidated balance sheet included in the Company's Form 10-Q filed on November 16, 2015 reflected aggregate net sales for the quarter ended September 30, 2015 of $519.6 million – $10.6 million less than reflected in the Company's October 22, 2015 press release – and that the Company's reduction in net sales also resulted in a reduction in GAAP net income of $6.8 million, or $0.13 per diluted share, from $20.5 million reported in the Company's October 22, 2015 press release to $13.7 million in the Form 10-Q filed on November 16, 2015, the Company's Form 8-K/A effectively restated the Company's financial results reported on Form 8-K on October 22, 2015.

68.     Within Super Micro's Form 10-Q filed on November 16, 2015, the Company stated:

**Note 12.     Prior Period Adjustment Recorded in Current Quarter**

In November 2015, the Company identified errors related to revenue which was recognized prior to meeting US GAAP revenue recognition criteria which ***impacted fiscal years 2013, 2014 and 2015.*** The Company determined that certain contracts for extended warranties on products were recorded as revenue at the time of sale of the product in prior periods instead of being deferred and amortized over the contractual warranty period. ***The cumulative impact of this error pertaining to prior periods through June 30, 2015 was to overstate net sales and net income by $9,259,000 and $5,926,000, respectively***. To compute the amount of the error, the Company determined a best estimated selling price for the extended warranty contracts based on prices charged to customers for these contracts when sold separately. ***This error was corrected in the quarter ended September 30, 2015 by reducing net sales by $9,259,000 and net income by $5,926,000, respectively***.

69.     Notably, Super Micro did not state that the errors identified within the Form 10-Q were immaterial with respect to each quarter in FY14 and FY15.

70.     Additionally, within Super Micro's Form 8-K/A, the Company stated:

The Company has determined the cumulative impact on revenue that should have been deferred for the applicable contracts for the three prior fiscal year period ended June 30, 2015 was $9.3 million ***and for the quarter ended September 30, 2015 was $1.3 million***. As a result, the condensed consolidated statement of operations and condensed consolidated balance sheet included in the Company's

Form 10-Q reflect aggregate net sales for the quarter ended September 30, 2015 of $519.6 million, $10.6 million less than reflected in the October Press Release.  This deferred revenue will be recognized through January 2019.  The reduction in net sales also resulted in a reduction in GAAP net income of $6.8 million, or $0.13 per diluted share, from $20.5 million reported in the October Press Release to $13.7 million in the Form 10-Q. GAAP net income of $0.8 million or $0.02 per diluted share was related to the quarter ended September 30, 2015.

71.     On November 16, 2015, the Company filed a 10-K/A to amend Super Micro's statements regarding internal control over financial reporting:

"We did not have a control in place that is designed to review underlying sales contracts for certain **extended warranty** to identify additional deliverables provided to customers as a part of sales transactions entered into by us.  As a result, certain **extended warranty** revenue recorded in prior periods did not meet the criteria for revenue recognition and should have been deferred and recorded over the contractual period of the **extended warranty**."

72.     Super Micro's Form 8-K/A issued on November 16, 2015 represented the Company's only quantification of its error previously disclosed on November 10, 2015.  As a result, Super Micro's stock declined on November 17-18, 2015 – with unusually high volume on November 18, 2015.

### THE COMPANY'S MISSTATEMENTS WERE MATERIAL

73.     The errors that Super Micro reported were material with respect to the Company's financial statements during the Class Period.  First, the misstatement was material regarding Super Micro's reporting of net sales.  Super Micro reported net sales of $519,618,000 in its Form 10-Q.  The out-of-period adjustment that Super Micro reported was $9,259,000.  The restated net sales amount was $528,877,000.  Thus, the error reported by the Company in net sales regarding Super Micro's October 22, 2015 release was $1,358,000.  This error, therefore, constituted a material error because $528,877,000 was below the lower end of the guidance that the Company provided on August 10, 2015 of $529 million to $530 million.

74.     Super Micro's errors were also material with respect to the Company's non-Generally Accepted Accounting Principles ("GAAP") gross margin:

|  |  | GAAP |  |  | Non-GAAP |
|---|---|---|---|---|---|
|  |  | 8-K, 10/22 | error | adj. | 10-Q, 11/16 |
| Net sales |  | 530,235 | (1,358) |  | 528,877 |
| Cost of sales |  | 447,403 |  | (240) | 447,163 |
| Gross Profit |  | 82,832 |  |  | 81,714 |
|  |  |  |  |  | **15.5%** |

75.     As the above chart reflects, the guidance that the Company provided on October 8, 2015 was for 15.6% to 15.7%.  In the Company's October 22, 2015 release (and within Slide 16 of the Company's investor presentation on the same date), this metric met the Company's guidance:

|  | **Q1'16** | **Q4'15** | **Q1'15** |
|---|---|---|---|
| **Net Sales** | $530,200,000 | $573,600,000 | $443,300,000 |
| **Non-GAAP Gross Margin** | 15.7% | 15.7% | 15.7% |

76.     The restated metric, therefore, missed the Company's guidance and is therefore material.  Gross margin, moreover, was a key metric for the Company.

77.     Additionally, the Company's errors also had a material effect on the Company's non-GAAP net income per common share – diluted.  As indicated above, the guidance that the Company provided on October 8, 2015 was "a range of $0.44 to $0.45."  The actual range announced on October 22, 2015 was at the higher end of the range – $0.45.  The Company's restated metric – based upon the Company's Form 10-Q – was below the guidance provided by the Company:

|  |  |  |  |
|---|---|---|---|
| Net Income in 10-Q | 13,699 |  |  |
| Out-of-period adj. | 5,926 | per Note 12 |  |
| "restated" net incme | 19,625 |  |  |
| Net imcome in 10/22 release | 20,494 |  |  |
| ERROR impact on net income | 869 |  |  |

| | | GAAP | | | Non-GAAP |
|---|---|---|---|---|---|
| | | 8-K, 10/22 | error | adj. | 10-Q, 11/16 |
| Net Income | | 20,494 | (869) | 2,928 | 22,553 |
| Diluted - Non-GAAP #shares | | | | | 52,042 |
| Non-GAAP NET INCOME PER COMMON SHARE – DILUTED | | | | | **0.43** |

78.     Super Micro's restated metric for non-GAAP net income per common share – diluted was below the Company's guidance range and was therefore material.

79.     The Company's errors also had a material impact upon Super Micro's non-GAAP operating margin.   Although this metric was not included in the guidance that the Company provided on October 8, 2015, the metric was contained on page 10 of the Company's October 22, 2015 investor presentation and on the call that Super Micro conducted with analysts: "[w]e have put out targets previously and we are still – we have not changed those targets for our gross margins, that being at 16% to 18% and operating margins at 7% to 9% within the next few years."

80.     The actual guidance that Super Micro provided in the Company's October 22, 2015 release was 6.8%, close to the Company's stated "target" range.   The restated metric, however, is 6.5%:

| | | GAAP | | | Non-GAAP |
|---|---|---|---|---|---|
| | | 8-K, 10/22 | error | adj. | 10-Q, 11/16 |
| Net sales | | 530,235 | (1,358) | | 528,877 |
| Operating income | | 32,057 | (1,358) | 3,876 | 34,575 |
| | | | | | **6.5%** |

81.     Thus, the Company's non-GAAP operating margin was significantly lower than the margin that Super Micro reported on October 22, 2015.

82.     The Company's errors were also material because they affected the Company's "systems" business.   In its 10-Q, the Company categorized sales into two product lines:

| | | | | | Oct-22 Release |
|---|---|---|---|---|---|
| As reported | Q1-15 | Q2-15 | Q3-15 | Q4-15 | Q1-16 |
| Server systems | 255,609 | 302,256 | 301,953 | 353,790 | 366,923 |
| Subsystems and accessories | 187,713 | 200,758 | 169,272 | 219,804 | 163,312 |
| | 443,322 | 503,014 | 471,225 | 573,594 | 530,235 |

83.     The Company's "systems" business line had a higher margin and a higher growth rate.  Indeed, the Company's systems sales drove the Company's gross margins and operating margins.

84.     Additionally, the GAAP violation in the Company's October 22, 2015 Form 8-K was material in accordance with SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45, 150 (1999) ("SAB No. 99"), 1999 WL 1123073 (Aug. 12, 1999), because the Company met the guidance it issued on October 8, 2015 because of the GAAP violation.

## SCIENTER ALLEGATIONS

85.     Numerous facts demonstrate that Defendants acted with knowledge or deliberate recklessness.  Such facts included – but are not limited to: (1) even though the critical accounting policy in the Company's Form 10-K describes non-extended warranty, it is nevertheless a warranty; (2) the very long duration of the period in which the Company's errors are repeatedly committed (three years and one quarter); (3) Defendants' deliberate non-disclosure of service revenue amounts; and (4) the small number of system sales in a quarter (for example, 84 sales contracts in the first quarter of 2016).

86.     Super Micro's errors, moreover, occurred in several geographic regions, demonstrating that the errors were not isolated incidents:

| 10/22 Investor presentation, page 5 | | 10-Q | Error |
|---|---|---|---|
| USA - 65.4% | 346,774 | 338,696 | 8,078 |
| Eurpoe - 16.6% | 88,019 | 86,826 | 1,193 |
| Asia - 14.2% | 75,293 | 74,657 | 636 |
| Other -3.8% | 20,149 | 19,439 | 710 |
| | 530,235 | 519,618 | 10,617 |

87.     As a result, Defendants' failure to identify additional deliverables provided to customers as a part of sales transactions was a manipulation device employed by Defendants when Super Micro faced trouble meeting guidance.

88.     Accounts from CWs also demonstrate that Defendants acted with scienter.  CW1 was a sales account manager at Super Micro from January 2013 through February 2014.  CW1 stated that the Company's marketing team was very small and corrupt.  Specifically, CW1 stated that the Company's marketing department would give away a lot of Super Micro's products, but would fail to account for the products or where the products were sent.  CW1 stated that this practice was most common with Intel CPU's.  CW1 also stated that his manager would have no problem compensating Super Micro customers or distributors using marketing expenses.  For instance, CW1 stated that the Company's customers would buy Super Micro's products and obtain points.  According to CW1, the points were then used to obtain marketing-related merchandise.  CW1 also stated that Super Micro – particularly CEO Liang and the Company's Vice President of Business Development – would assign weekly quotas.  According to CW1, the quotas that were set were unrealistic.

89.     CW2 served as a credit and collections analyst at Super Micro from October 2013 through March 2015.  CW2 stated that Super Micro had a lot of accounts receivable on the Company's books.  CW2 stated that the Company's collections department consisted of only four collectors and that they were serving approximately 1,400 accounts.  CW2 stated that the volume with respect to accounts receivable was insane.  Additionally, CW2 stated that the Company's

marketing department had weekly co-op programs and that individuals in marketing might be under budget for particular campaigns.  If such were the case, the Company's marketing department would move co-op dollars from one customer to another to make up the difference.

90.    CW3 was an administrative assistant at Super Micro from February 2015 through November 2015.  According to CW3, the Company's sales people would have to obtain CEO Liang's signature on sales orders based upon the size of the order.  CW3 believes that the threshold was $1 million.

91.    CW4 served as a Sales Account Manager at Super Micro from December 2012 to September 2015.  Throughout CW4's employment, CW4 reported to Gloria Sun ("Sun"), Vice President of Strategic Accounts and former Senior Sales Director at Super Micro.  Sun reported to Phidias Chou ("Chou"), Vice President of Worldwide Sales at Super Micro since September 2008.

92.    CW4 stated that CW4 saw some sales people at Super Micro shifting the dates on purchase orders at the Company, and that some sales people would ship products before the date requested by customers without seeking permission from the customer.  CW4 also stated that VP of Strategic Accounts Sun shipped products without the consent of customers, and that customers refused shipments.  CW4 stated that the products and systems that were shipped without the consent of customers were optimized for customer application, which included unique CPUs, so when systems were returned, Super Micro had parts that had to be scrapped.  CW4 stated further that CW4 heard that Super Micro was not making money on some deals with many of the Company's largest customers, including Apple, OVH, and Limelight.  CW4 said that Super Micro was providing substantial discounts to such customers.  CW4 stated that Super Micro's management became aware of the products that VP of Strategic Accounts Sun shipped without the consent of the customer.  CW4 also stated that VP of Strategic Accounts Sun shipped products and asked customers to simply hold the products, knowing that the products were not what the

customers wanted and that the products would be returned.  CW4 stated that after VP of Worldwide Sales Chou learned about the products that VP of Strategic Accounts Sun shipped without the consent of the customer, Super Micro took no action and no changes occurred.

93.    CW4 also stated that the Company's marketing credits were supposed to be used for co-marketing, but that the Company routinely used these credits to provide discounts to customers for current purchases.  CW4 said that marketing funds were based upon a percentage of sales dollar spent with the Company, but that there were numerous instances where the marketing credits appeared on invoices as a discount.  CW4 said that all of the Company's sales teams knew this practice was occurring.  Additionally, CW4 said that Super Micro's management tracked all of the Company's orders and that co-marketing funds were automatically created.  CW4 stated that customers and distributors were compensated for marketing expenses through co-marketing funds.

94.    CW4 also stated that Super Micro routinely used such co-marketing funds improperly for the use of "demos."  For example, CW4 stated that there were numerous instances where the Company's sales people would look at an order for 10 systems, and then change the paperwork to show nine systems.  Super Micro's sales peopled would then give one system to the customer as a "demo."  Demos were supposed to be used for shows, and Super Mirco's sales people had to get "demo" machines approved for marketing.  CW4 said that VP of Worldwide Sales Chou approved the practice, along with personnel from finance and accounting, as well as the sales team leader.

95.    CW4 further stated that many of Super Micro's customers were actually leasing products, not buying them.  CW4 said that the reason that customers leased equipment was because they did not have the cash to buy the equipment, and that Super Micro had a relationship with IBM Global Financing as a leasing company.  CW4 stated that Super Micro would sell the

equipment to the leasing company who would then own the equipment.  CW4 believes that the Company's management recorded these transactions as sales rather than as leases.

## POST CLASS PERIOD EVENTS

96.     On February 4, 2016, Super Micro filed its Form 10-Q for the quarterly period ended December 31, 2015.  Within the Form 10-Q, the Company stated the following:

*Evaluation of Effectiveness of Disclosure Controls and Procedures*

Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) and 15d-15(e) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act").  The evaluation considered the procedures designed to ensure that information required to be disclosed by us in the reports filed or submitted by us under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms and is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. ***Due to the material weakness in internal control over financial reporting described below, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were not effective, and were not operating at the reasonable assurance level as of December 31, 2015.***

***In November 2015, our management identified an error in accounting treatment of certain contracts with extended warranty provisions.  Our management has identified a deficiency in the design of a control that represents a material weakness in internal control over financial reporting as follows:***

***We did not have a control in place that is designed to review underlying sales contracts to identify additional deliverables provided to customers as part of sales transactions entered into by us.  As a result, certain extended warranty revenue recorded in prior periods did not meet the criteria for revenue recognition and should have been deferred and recorded over the contractual period of the extended warranty.***

***Because of the material weakness identified, our management has concluded that our internal control over financial reporting was not effective as of December 31, 2015.***

*Changes in Internal Control over Financial Reporting*

There were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter ended

December 31, 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. *However, as noted below, we have implemented changes to our internal control over financial reporting to address the material weakness described above*.

*Remediation*

*We have put a control in place to ensure that proper extended warranty and any other deliverables in our bill of materials are tracked and related revenue deferrals are recorded. The following steps have been implemented:*

- *Initiation of a review of extended warranty and any other deliverables in our bill of materials for all products*
- *Increased oversight and monitoring by our management of extended warranty and other deliverables in our bill of materials for any new products*
- *Documenting and tracking extended warranty and other deliverables in our contract matrix to ensure proper revenue recognition*

97.     On September 14, 2017, the Company issued a press release announcing the receipt of a Non-Compliance letter from NASDAQ.  Within the press release, the Company announced the following:

SAN JOSE, Calif. – (BUSINESS WIRE) – *Super Micro Computer, Inc. (NASDAQ:SMCI), a global leader in high-performance, high-efficiency server, storage technology and green computing, today announced that the Company received a notification letter from Nasdaq stating that the Company is not in compliance with Nasdaq listing rule 5250(c)(1), which requires timely filing of reports with the U.S. Securities and Exchange Commission. The September 14, 2017 letter was sent as a result of the Company's delay in filing its Annual Report on Form 10-K for the period ending June 30, 2017 (the "Form 10-K"). The Form 10-K was due on August 29, 2017.  The Company filed a Form 12b-25 on August 29, 2017, the effect of which was to extend the due date for the Form 10-K to September 13, 2017.  The Company was unable to file the Form 10-K by September 13, 2017, for the reasons reported in the Form 12b-25 and further described below*.

\* \* \*

*As previously disclosed by the Company, additional time is needed for the Company to compile and analyze certain information and documentation and finalize its financial statements, as well as complete a related audit committee review, in order to permit the Company's independent registered public accounting firm to complete its audit of the financial statements to be incorporated in the Form 10-K and complete its audit of the Company's internal*

*controls over financial reporting as of June 30, 2017.  The Company is unable at this time to provide a date as to when the review and the audits will be completed.*

There is no update to the Company's previously announced guidance for net sales for the first quarter of fiscal year 2018 ending September 30, 2017.  *However, as a result of additional efforts required to finalize the financial statements and complete the audit committee review, the Company expects operating expenses for the quarter to increase due to higher legal and accounting costs.*

98.    A Susquehanna report dated September 19, 2017 entitled "SuperMircro: 10-K Delay Moves Us to the Sidelines; Downgrading to Neutral" stated the following:

We are downgrading shares of SMCI to Neutral, *to reflect uncertainty surrounding a delay in filing its 10-K.  Specifically, we note that SMCI has had a run in with auditors in the past as it pertains to accounting for marketing expenses (in 2015)* . . . .  *In this case, the extent of the potential issues remain unclear, and with the inability to file the 10-K within the two-week extension period, we choose to move to the sidelines to await further clarity on the scope and magnitude of any issue causing the delay.*

99.    On October 12, 2017, the Company issued a press release announcing the date of first quarter fiscal 2018 preliminary financial information.  Within the press release, the Company stated the following:

SAN JOSE, Calif. – (BUSINESS WIRE) –  Super Micro Computer, Inc. (NASDAQ:SMCI), a global leader in high-performance, high-efficiency server, storage technology and green computing, today announced that it will release first quarter fiscal 2018 preliminary financial information on Thursday, October 26, 2017.

*As previously disclosed by the Company, additional time is needed for the Company to compile and analyze certain information and documentation and finalize its financial statements for the fiscal year ended June 30, 2017, as well as complete a related audit committee review prior to completion of the integrated audit of the consolidated financial statements incorporated into the Company's Annual Report on Form 10-K.  The Company is unable at this time to provide a date as to when the Company's Annual Report on Form 10-K and Form 10-Q for the first quarter of fiscal 2018 will be filed.*

100.    On October 26, 2017, the Company issued a press release announcing its first quarter fiscal 2018 preliminary financial information.  Within the press release, the Company announced the following:

Delayed 10-K

As previously disclosed by the Company, additional time is needed for the Company to compile and analyze certain information and documentation and finalize its financial statements, as well as complete a related audit committee review, in order to permit the Company's independent registered public accounting firm to complete its audit of the financial statements to be incorporated in the Form 10-K and complete its audit of the Company's internal controls over financial reporting as of June 30, 2017.

***In connection with the in-process audit of the Company's financial results for the year ended June 30, 2017, a sales transaction was subject to additional inquiry and review. The transaction in question was originally recorded as revenue during the quarter ended December 31, 2016. However, prior to review by the Company's independent auditors and prior to the Company's public announcement of its results for the quarter, the recognition of revenue was reversed and the revenue was subsequently recognized in the quarter ended March 31, 2017. When the audit committee was made aware of this transaction, the Audit Committee of the Company's Board of Directors initiated an independent investigation to determine whether there were any similar transactions and if so, whether such transactions were properly accounted for. Due to the volume of data to be reviewed to complete the investigation, the Company was unable to file its Form 10-K on a timely basis***.

The Company is unable at this time to provide a date as to when the investigation and the 2017 audits will be completed or predict the possible outcome of the investigation.

NASDAQ Compliance Plan

***Super Micro announced on September 14, 2017 that it received a notification letter from Nasdaq stating that the Company is not in compliance with Nasdaq listing rule 5250(c)(1), which requires timely filing of reports with the U.S. Securities and Exchange Commission. The September 14, 2017 letter was sent as a result of the Company's delay in filing its Annual Report on Form 10-K for the year ended June 30, 2017 (the "Form 10-K"). The Form 10-K was due on August 29, 2017. The Company filed a Form 12b-25 on August 29, 2017, the effect of which was to extend the due date for the Form 10-K to September 13, 2017. The Company was unable to file the Form 10-K by September 13, 2017, for the reasons reported in the Form 12b-25 and further described above.***

101.    On November 13, 2017, the Company issued a press release announcing the filing of a compliance plan with NASDAQ. Within the press release, the Company announced the following:

1
2
3
4
5

*SAN JOSE, Calif. — (BUSINESS WIRE) – **Super Micro Computer, Inc. (NASDAQ:SMCI), a global leader in high-performance, high-efficiency server, storage technology and green computing, today announced that on November 10, 2017 it had submitted a compliance plan to The NASDAQ Stock Market ("NASDAQ") to support its request for an extension of time to regain compliance with the NASDAQ continued listing requirements.  Pursuant to NASDAQ rules, Super Micro's securities will remain listed on the NASDAQ Global Select Market pending NASDAQ's review of the compliance plan**.*

6
7
8
9

102.    On November 20, 2017, the Company issued a press release announcing the receipt of a Non-Compliance Letter from NASDAQ.  Within the press release, the Company announced the following:

10
11
12
13
14
15
16
17
18

*SAN JOSE, Calif. – (BUSINESS WIRE) – **Super Micro Computer, Inc. (NASDAQ:SMCI), a global leader in high-performance, high-efficiency server, storage technology and green computing, today announced that the Company received a notification letter (the "Letter") on November 16, 2017 from Nasdaq stating that the Company is not in compliance with Nasdaq listing rule 5250(c)(1), which requires timely filing of reports with the U.S. Securities and Exchange Commission.  The Letter was sent as a result of the Company's delay in filing its Quarterly Report on Form 10-Q for the period ended September 30, 2017 (the "Form 10-Q") and its continued delay in filing its Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (the "Form 10-K").  The Company previously submitted a plan of compliance to NASDAQ on November 10, 2017 (the "Plan") with respect to its delay in filing the Form 10-K (the "Initial Delinquent Filing"). Upon review of the Plan and in connection with this additional delinquency, the Letter requires that the Company submit an update to the Plan by November 30, 2017 (the "Revised Plan").***

19

\* \* \*

20
21
22
23
24
25

*As previously disclosed by the Company, additional time is needed for the Company to compile and analyze certain information and documentation and finalize its financial statements as of and for the year ended June 30, 2017, as well as complete a related audit committee investigation, in order to permit the Company's independent registered public accounting firm to complete its audit of the financial statements and the Company's internal controls over financial reporting as of June 30, 2017.  The Form 10-Q cannot be completed and filed until the Form 10-K is completed and filed.  The Company is unable at this time to provide a date as to when the financial statements, the audit committee investigation and the following audit and review will be completed.*

26
27
28

The Company intends to file the Form 10-K upon completion of the audit committee's investigation, preparation of the financial statements and the completion of the 2017 audit.  The Company intends to file the Form 10-Q, thereafter and upon the completion of the audit committee's investigation,

preparation of the financial statements and completion of the review as of and for the three months ended September 30, 2017.

103.    On November 30, 2017, Super Micro issued a press release announcing the filing of a revised compliance plan with NASDAQ.  Within the press release, the Company stated the following:

> SAN JOSE, Calif. – (BUSINESS WIRE) – *Super Micro Computer, Inc. (NASDAQ:SMCI), a global leader in high-performance, high-efficiency server, storage technology and green computing, today announced that on November 29, 2017 it had submitted a revised compliance plan to The NASDAQ Stock Market ("NASDAQ") to support its request for an extension of time to regain compliance with the NASDAQ continued listing requirements.  Pursuant to NASDAQ rules, Super Micro's securities will remain listed on the NASDAQ Global Select Market pending NASDAQ's review of the revised compliance plan*. Super Micro intends to take all necessary steps to achieve compliance with the NASDAQ continued listing requirements as soon as practicable.

## CLASS ACTION ALLEGATIONS

104.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased the Company's common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have, or had, a controlling interest.

105.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's common stock was actively traded on NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent, and may be notified of

the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

106.   Plaintiff's claims are typical of the claims of the members of the Class, since all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law alleged herein.

107.   Plaintiff will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in class action and securities litigation.

108.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts constituted violations of the federal securities laws;

(b)     whether Defendants' statements made to the investing public during the Class Period misrepresented material facts concerning the Company's business, operations, and financial condition;

(c)     whether the price of the Company's common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

109.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   Additionally, there will be no difficulty in the management of this action as a class action.

1

## LOSS CAUSATION

2

110.    During the Class Period, as detailed herein, Defendants engaged in a scheme to

3

deceive the market and a course of conduct that artificially inflated the price of the Company's

4

common stock.  Defendants' conduct, moreover, operated as a fraud or deceit on Class Period

5

purchasers of the Company's common stock by failing to disclose, and misrepresenting, the

6

adverse facts detailed herein.  As Defendants' prior misrepresentations and fraudulent conduct

7

were disclosed and became apparent to the market, the price of the Company's common stock

8

declined significantly as the prior artificial inflation dissipated from the Company's stock price.

9

111.    As a result of the purchases of the Company's common stock during the Class

10

Period, Plaintiff and the other members of the Class suffered economic loss (damages) under the

11

federal securities laws.  Defendants' false and misleading statements had the intended effect, and

12

caused, the Company's common stock to trade at artificially inflated levels throughout the Class

13

Period.

14

112.    By concealing from investors the adverse facts detailed herein, Defendants

15

presented a misleading picture of the Company's business and prospects.  As the truth regarding

16

the Company was revealed to the market, the price of the Company's common stock fell

17

significantly.  These declines removed the inflation from the price of the Company's common

18

stock, causing real economic loss to investors who purchased the Company's common stock

19

during the Class Period.

20

113.    The declines in the price of the Company's common stock after the corrective

21

disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent

22

misrepresentations being revealed to investors and the market.  The timing and magnitude of the

23

price declines in the Company's common stock negate any inference that the loss suffered by

24

25

26

27

28

Plaintiff and the other Class members was caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to defendants' fraudulent conduct.

114.    During the Class Period, the Company's stock price declined as the Company's true financial condition was revealed to the investing public.

115.    The economic loss (damages) suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's common stock and the subsequent significant decline in the value of the Company's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

116.    At all relevant times, the market for the Company's common stock was an efficient market for the following reasons, among others:

(a)     The Company's common stock met the requirements for listing, and was listed and actively traded on, NASDAQ, a highly efficient, electronic stock market;

(b)     As a regulated issuer, the Company filed periodic public reports with the SEC;

(c)     The Company regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     The Company was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

117.    As a result of the foregoing, the market for the Company's common stock promptly digested current information concerning the Company from all publicly available sources and reflected such information in the prices of the Company's stock.  Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

118.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein.  Many of the specific statements alleged herein were not identified as "forward-looking statements" when made, and thus are not entitled to protection under the safe harbor provision.  Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

**COUNT I**
**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants**

119.    Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

120.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or were deliberately reckless in not knowing, were misleading.  These statements were false and misleading because they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

121.    Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact/and or omitted to state material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

122.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid – or at all – if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

123.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II
**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

124.    Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

125.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the

Company's operations and/or intimate knowledge of the Company's statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

126.    The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein.  The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected.  Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

127.    The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

128.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: December 1, 2017                    **GLANCY PRONGAY & MURRAY LLP**

By:  *s/ Ex Kano S. Sams II*
Lionel Z. Glancy
Robert V. Prongay
Ex Kano S. Sams II
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
Email: lglancy@glancylaw.com
           rprongay@glancylaw.com
           esams@glancylaw.com

*Lead Counsel for Lead Plaintiff and the Class*

1

**<u>PROOF OF SERVICE BY ELECTRONIC POSTING</u>**

2
    I, the undersigned say:

3
    I am not a party to the above case, and am over eighteen years old.  On December 1, 2017, I

4
served true and correct copies of the foregoing document, by posting the document electronically to

5
the ECF website of the United States District Court for the Northern District of California, for receipt

6
electronically by the parties listed on the Court's Service List.

7
    I affirm under penalty of perjury under the laws of the United States of America that the

8
foregoing is true and correct.  Executed on December 1, 2017, at Los Angeles, California.

9

10
                        *s/ Ex Kano S. Sams II*

11
                        Ex Kano S. Sams II

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 5:15-cv-04049-EJD Deason v. Super Micro Computer, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **David Allen Priebe**
  david.priebe@dlapiper.com,margaret.austin@dlapiper.com,carmen.manzano@dlapiper.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,bmurray@glancylaw.com

- **Ex Kano S. Sams , II**
  esams@glancylaw.com

- **Shirli Fabbri Weiss**
  shirli.weiss@dlapiper.com,emiko.gonzales@dlapiper.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)