Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Ex Kano S. Sams II (#192936)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: lglancy@glancylaw.com
        rprongay@glancylaw.com
        esams@glancylaw.com

*Lead Counsel for Lead Plaintiff and the Class*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DALE DEASON, Individually and On Behalf of All Others Similarly Situated, | ) Case No. 5:15-cv-04049-EJD ) |
| Plaintiff, | ) **PLAINTIFF'S OPPOSITION TO** |
| v. | ) **DEFENDANTS' MOTION TO DISMISS** ) **SECOND AMENDED COMPLAINT** |
| SUPER MICRO COMPUTER, INC., CHARLES LIANG, and HOWARD HIDESHIMA, | ) ) ) ) |
| Defendants. | ) ) ) |

# TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................... 1

II. STATEMENT OF FACTS ......................................................................................... 2

III. STANDARD OF REVIEW ....................................................................................... 4

IV. PLAINTIFF ADEQUATELY ALLEGES VIOLATIONS OF THE EXCHANGE ACT ........ 4

    A.   Plaintiff Sufficiently Alleges that Defendants Made Materially False and Misleading Statements ...................................................................................... 5

        1.   On August 4, 2015, Defendants Falsely Reported the Company's Revenue, Net Sales, Net Income, and Guidance .................................. 5

        2.   On October 22, 2015, Defendants Reported False Financial Results for the Company ................................................................................. 7

        3.   Defendants Reported False and Misleading Financial Information Regarding the Company's Operating Expenses Involving Costs Related to Certain Marketing Expenses ....................................................... 8

        4.   Defendants' Misrepresentations Were Material ........................................... 9

        5.   Defendants' SOX Certifications Were Materially False and Misleading ... 12

        6.   The Company Need Not Formally Restate Its Financial Results in Order for Defendants To Be Liable Under the Exchange Act .................................... 13

        7.   The PSLRA's Safe Harbor Provision Does Not Protect Defendants' False and Misleading Statements .......................................................................... 14

    B.   Plaintiff Adequately Alleges that Defendants' Misrepresentations Were Made With Scienter ................................................................................................................ 16

        1.   The Departure of Several of the Company's Top Executives at the Same Time as the Audit Committee's Announcement of the Completion of its Accounting Investigation Supports a Strong Inference of Scienter ............ 17

        2.   The Confidential Witnesses Support a Strong Inference of Scienter ......... 17

        3.   The Severity of the Company's Internal Control Problems Bolsters the Strong Inference of Scienter Alleged ......................................................... 19

        4.   The Company's Implementation of Widespread Internal Reforms Supports a Strong Inference of Scienter .................................................................... 20

5.   Defendants' Practice of Channel Stuffing is Indicative of a Strong Inference of Scienter ................................................................................. 20

6.   Defendants' SOX Certifications Add to the Strong Inference of Scienter Alleged ......................................................................................... 21

7.   Defendants' Assertions Do Not Negate the Strong Inference of Scienter Alleged ......................................................................................... 22

C.   Plaintiff Adequately Alleges Loss Causation ......................................................... 23

D.   Defendants' Standing Argument is Meritless ........................................................ 24

E.   Plaintiff Sufficiently Alleges Control Person Liability ........................................... 25

V.   CONCLUSION ..................................................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

3

<u>CASES</u>

4

*Alaska Elec. Pension Fund v. Adecco S.A.*,
    371 F. Supp. 2d 1203 (S.D. Cal. 2005) ................................................................. 13

5

6

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) ..................................................................................... 13

7

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................. 4

8

9

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ........................................................................................... 10, 22

10

11

*Batwin v. Occam Networks, Inc.*,
    No. 07-2750 CAS (SHx), 2008 WL 2676364 (C.D. Cal. July 1, 2008) ................. 12

12

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................. 4

13

14

*Berson v. Applied Signal, Tech.*,
    527 F.3d 982 (9th Cir. 2008) ................................................................................... 8

15

16

*Bielousov v. GoPro, Inc.*,
    No. 16-cv-06654-CW, 2017 WL 3168522 (N.D. Cal. July 26, 2017) .................... 17

17

18

*Blatt v. Muse Techs., Inc.*,
    No. CIV.A. 01-11010-DPW, 2002 WL 31107537 (D. Mass. Aug. 27, 2002) .......... 14

19

*Brody v. Transitional Hospitals Corp.*,
    280 F.3d 997 (9th Cir. 2002) ................................................................................... 11

20

21

*Cunha v. Hansen Nat. Corp.*,
    No. EDCV 08-1249-GW JCX, 2011 WL 8993148 (C.D. Cal. May 12, 2011) ........ 21

22

23

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ................................................................................................. 23

24

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
    751 F.3d 990 (9th Cir. 2014) ................................................................................... 16

25

26

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ................................................................................. 25

27

28

*Flynn v. Sientra, Inc.*,
  No. CV1507548SJORAOX, 2016 WL 3360676 (C.D. Cal. June 9, 2016) ............................... 19

*Hoexter v. Simmons*,
  140 F.R.D. 416 (D. Ariz. 1991) .......................................................................................... 25

*In re Am. Serv. Grp., Inc.*,
  No. 3:06-0323, 2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) ................................. 12

*In re Amylin Pharma., Inc. Sec. Litig.*,
  No. 01CV1455BTM (NLS), 2002 WL 31520051 (S.D. Cal. Oct. 10, 2002) ........................... 16

*In re Atossa Genetics Inc Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017) .................................................................................... 15, 16

*In re Banc of California Sec. Litig.*,
  No. SACV1700118AGDFMX, 2017 WL 3972456 (C.D. Cal. Sept. 6, 2017) ...................... 17

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ......................................................................................... 4

*In re Home Health Corp. of Am. Sec. Litig.*,
  No. CIV.A. 98-834, 1999 WL 79057 (E.D. Pa. Jan. 28, 1999) ................................... 11

*In re Kidder Peabody Sec. Litig.*,
  10 F. Supp. 2d 398 (S.D.N.Y. 1998) ............................................................................ 11

*In re LDK Solar Sec. Litig.*,
  584 F. Supp. 2d 1230 (N.D. Cal. 2008) ....................................................................... 13

*In re Proquest Sec. Litig.*,
  527 F. Supp. 2d 728 (E.D. Mich. 2007) ....................................................................... 12

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017).............................................................................. *passim*

*In re Sipex Corp. Sec. Litig.*,
  No. 05-392, 2005 WL 3096178 (N.D. Cal. Nov. 17, 2005)........................................ 11, 20

*In re St. Jude Med., Inc. Sec. Litig.*,
  836 F. Supp. 2d 878 (D. Minn. 2011) ....................................................................... 14, 21

*In re STEC Inc. Sec. Litig.*,
  No. CV09-08536-JVS MLGX, 2011 WL 2669217 (C.D. Cal. June 17, 2011) ...................... 15

*In re Stellent, Inc. Sec. Litig.*,
  326 F. Supp. 2d 970 (D. Minn. 2004) ......................................................................... 14

*In re UTStarcom, Inc. Sec. Litig.*,
 617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................................................ 17

*In re Veeco Instruments, Inc. Sec. Litig.*,
 235 F.R.D. 220 (S.D.N.Y. 2006)......................................................................... 20

*In re VeriFone Holdings, Inc. Sec. Litig.*,
 704 F.3d 694 (9th Cir. 2012)................................................................. 16, 19, 21

*In re VeriSign, Inc.*,
 No. C 02-02270 JW(PVT), 2005 WL 88969 (N.D. Cal. Jan. 13, 2005)............................... 24, 25

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
 No. 2672 CRB (JSC), 2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ............................. 17

*In re Williams Sec. Litig.*,
 339 F. Supp. 2d 1206 (N.D. Okla. 2003) ............................................................ 14

*Litwin v. Blackstone Group, L.P.*,
 634 F.3d 706 (2d Cir. 2011) ............................................................................... 10

*Lloyd v. CVB Fin. Corp.*,
 811 F.3d 1200 (9th Cir. 2016)....................................................................... 11, 24

*Lloyd v. CVB Fin. Corp.*,
 No. CV1006256MMMPJWX, 2012 WL 12883522 (C.D. Cal. Jan. 12, 2012) ........................ 13

*Matrixx Initiatives, Inc. v. Siracusano*,
 563 U.S. 27 (2011) ...........................................................................10, 22, 23

*Middlesex Ret. Sys. v. Quest Software Inc.*,
 527 F. Supp. 2d 1164 (C.D. Cal. 2007)......................................................... 12, 17

*Miller v. Thane Int'l, Inc.*,
 519 F.3d 879 (9th Cir. 2008).............................................................................. 11

*Mineworkers' Pension Scheme v. First Solar Inc.*,
 No. 15-17282, 2018 WL 626948 (9th Cir. Jan. 31, 2018) ................................... 24

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*,
 320 F.3d 920 (9th Cir. 2003)............................................................................. 23

*Oaktree Principal Fund V, LP v. Warburg Pincus LLC*,
 No. CV158574PSGMRWX, 2017 WL 3187688 (C.D. Cal. Jan. 17, 2017) .............................. 23

*Robb v. Fitbit Inc.*,
 No. 16-CV-00151-SI, 2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ........................... 19

*Rosen v. Textron, Inc.*,
    321 F. Supp. 2d 308 (D.R.I. 2004) ...................................................................... 14

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ............................................................................. 16

*S.E.C. v. Phan*,
    500 F.3d 895 (9th Cir. 2007) ............................................................................. 11

*Schueneman v. Arena Pharm., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ........................................................................... 8, 9

*Scott v. ZST Digital Networks, Inc.*,
    No. CV 11-03531 GAF (JCx), 2012 WL 538279 (C.D. Cal. Feb. 14, 2012) ............................ 21

*SEC v. Mozilo*,
    No. CV 09-3994-JFW MANX, 2010 WL 3656068 (C.D. Cal. Sept. 16, 2010) ........................ 23

*SEC v. Todd*,
    642 F.3d 1207 (9th Cir. 2011) ........................................................................... 25

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009) ........................................................................... 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .............................................................................. *passim*

*Thomas v. Magnachip Semiconductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016) .................................................................. 21

*Washtenaw Cty. Employees Ret. Sys. v. Celera Corp.*,
    No. 5:10-CV-02604 EJD, 2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) ................................ 24

*Wieland v. Stone Energy Corp.*,
    Civil Action No. 05-2088, 2007 WL 2903178 (W.D. La. Aug. 17, 2007) ............................... 12

*Yanek v. Staar Surigcal Co.*,
    388 F. Supp. 2d 1110 (C.D. Cal. 2005) .................................................................. 15

STATUTES

15 U.S.C. §78j(b) ....................................................................................... 5

15 U.S.C. §78u-4(b)(1)(B) ................................................................................ 5

15 U.S.C. §78u-4(b)(2) .................................................................................. 16

15 U.S.C. §78u-4(b)(4) .................................................................................. 23

1

15 U.S.C. §78u-5(c)(1)(A) ............................................................................................................ 14

2

RULES

3

Fed. R. Civ. P. 23 ........................................................................................................................... 25

4

REGULATIONS

5

64 Fed. Reg. 45 (1999) .................................................................................................................. 9

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.      INTRODUCTION

Recently – on January 30, 2018 – Defendant Super Micro Computer, Inc. ("Super Micro" or the "Company") announced that the Company's Audit Committee had completed its investigation related to the Company's financial statements and internal controls over financial reporting.[1]   The Company stated that "[a]dditional time is required to analyze the impact, if any, of the results of the investigation on the Company's historical financial statements . . . ."   *Id*.   **On the same day**, Super Micro also announced that "Wally Liaw, Sr. Vice President of International Sales, Phidias Chou, Sr. Vice President, Worldwide Sales and Howard Hideshima, Senior Vice President and Chief Financial Officer, have resigned, effective January 30, 2018."   *Id*.   The Company further announced that "Mr. Liaw has also resigned as a member of the Board of Directors of the Company (the "Board"), effective January 30, 2018."

The resignation of CFO Hideshima and other key Super Micro executives **on the same day** that the Company announced the completion of the Audit Committee's investigation is no coincidence.   Indeed, as alleged within the Second Amended Complaint for Violation of the Federal Securities Laws ("Complaint"), Defendants made materially false and misleading statements regarding the Company's internal controls and financial results throughout the Class Period.   Specifically, Defendants misrepresented and failed to disclose that: (1) Defendants improperly recorded revenue related to certain contracts that included extended product warranties as revenue in prior periods – instead of deferring and amortizing such revenue over the contractual periods – resulting in misstatements in the Company's financial statements; (2) Defendants

---

[1]      *See* Declaration of Ex Kano S. Sams II in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss Second Amended Complaint ("Sams Decl."), Exhibit ("Ex.") 1.   Defendants are Super Micro, Chief Executive Officer ("CEO") Charles Liang ("Liang"), and Chief Financial Officer ("CFO") Howard Hideshima ("Hideshima") (collectively "Defendants").   Defendants Liang and Hideshima are referred to herein as the "Individual Defendants."   The class period is from September 15, 2014 to November 16, 2015, inclusive (the "Class Period").

reported false and misleading financial information regarding the Company's operating expenses involving costs related to certain marketing expenses; and (3) Defendants made false and misleading statements regarding the Company's internal controls.  Defendants, moreover, were deliberately reckless in making these misstatements.  The accounts of several of the Company's own former employees – identified as Confidential Witnesses ("CWs") in the Complaint – demonstrate that Defendants acted with scienter.  The Company's implementation of widespread, internal reforms – along with Defendants' practice of channel-stuffing – also demonstrate Defendants' deliberate recklessness.  For the reasons discussed more fully below, the Court should deny Defendants' Motion to Dismiss Second Amended Complaint ("Motion").

## II.   STATEMENT OF FACTS

Super Micro develops server solutions based on modular and open-standard architecture. ¶22.[2]  On September 15, 2014, Super Micro announced the Company's financial and operating results for the fiscal quarter and year ended June 30, 2014 (the "2014 10-K").  ¶24.  The 2014 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.  ¶26.  Additionally, throughout the Class Period, CEO Liang and CFO Hideshima repeatedly represented that the Company's internal controls over financial reporting were adequate and that the Company's financial statements fairly presented, in all material respects, the financial condition and results of operations of the Company.  ¶¶26, 28, 30, 32, 40.

On August 4, 2015, Super Micro announced the Company's financial results for the fourth quarter and full year of 2015.  ¶34.  Also on August 4, 2015, Super Micro held a conference call to discuss the Company's financial results.  ¶36.  During the conference call, CFO Hideshima

[2]   Unless otherwise indicated, all paragraph ("¶") references are to Plaintiff's Complaint.

represented that "*[s]equentially, operating expenses were higher due to higher prototype and testing fees of approximately $1.4 million, and higher marketing and promotion costs of $0.9 million to support the development and promotion of new products*. *Id*.[3]  On August 31, 2015, Super Micro filed a Notification of Late Filing with respect to the Company's Form 10-K for the fiscal year ended June 30, 2015.  ¶38.  Within the Notification, the Company stated it "*recently discovered certain irregularities regarding certain marketing expenses and additional time is required for the Registrant to complete its investigation of the matter*."  *Id*.  On September 10, 2015, Super Micro filed its Form 10-K for the fiscal year ended June 30, 2015 ("2015 10-K").  ¶39.  The 2015 10-K made no reference to "irregularities regarding certain marketing expenses" that the Company announced within its August 31, 2015 Notification, and made no changes to the Company's financial statements contained within the Company's August 4, 2015 press release.  *Id*.

On October 8, 2015, Super Micro stated that it "anticipates that it will report revenue for its first quarter of fiscal 2016 in the range of $529 million to $530 million. This compares to the company's previous guidance range of $520 million to $580 million."  ¶35.  On November 16, 2015, the Company filed its Form 10-Q for the quarterly period ended September 30, 2015 and a Form 10-K/A.  ¶¶35, 66.  Super Micro's filings with the Securities and Exchange Commission ("SEC") corrected the Company's statements on internal controls.  *Id*.  The Company also filed a Form 8-K/A that amended Super Micro's Form 8-K filed on October 22, 2015.  *Id*.  Super Micro admitted that "the Company has determined that for certain contracts which included extended product warranties, revenue relating to the extended warranties was recorded as revenue in prior periods instead of being deferred and amortized over the contractual period" and that "the

---

[3] Unless otherwise indicated, all emphasis is added and all internal citations and quotations are omitted.

cumulative impact on revenue that should have been deferred for the applicable contracts for the three prior fiscal year period ended June 30, 2015 was $9.3 million . . . ." ¶35.

On November 16, 2015, Defendants announced that "[i]n November 2015, the Company identified errors related to revenue which was recognized prior to meeting US GAAP revenue recognition criteria which impacted fiscal years 2013, 2014 and 2015." *Id*. Super Micro determined that certain contracts for extended warranties on products were recorded as revenue at the time of sale of the product in prior periods instead of being deferred and amortized over the contractual warranty period. *Id*. Accordingly, Defendants admitted that the cumulative impact of this error pertaining to prior periods through June 30, 2015 was to overstate net sales and net income by $9,259,000 and $5,926,000, respectively. *Id*.

## III.    STANDARD OF REVIEW

A plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept all factual allegations in the complaint as true" and "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007). Courts must also construe the facts alleged "in the light most favorable to plaintiffs." *In re Daou Sys., Inc*., 411 F.3d 1006, 1013 (9th Cir. 2005).

## IV.    PLAINTIFF ADEQUATELY ALLEGES VIOLATIONS OF THE EXCHANGE ACT

Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") makes it unlawful "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or

deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. §78j(b).  To state a claim, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017).  Defendants only challenge the Complaint with respect to falsity and scienter.  Motion at 1.[4]

### A.      Plaintiff Sufficiently Alleges that Defendants Made Materially False and Misleading Statements

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA") – which is applicable to Section 10(b) claims – a plaintiff adequately pleads falsity by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B).  Statements are misleading if they "affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed." *Quality Sys.*, 865 F.3d at 1144.

### 1.      On August 4, 2015, Defendants Falsely Reported the Company's Revenue, Net Sales, Net Income, and Guidance

On August 4, 2015, Super Micro announced the Company's financial results for fourth quarter and full year of 2015.  ¶34.  The Company reported: (1) quarterly net sales of $573.6 million, up 21.7% from the third quarter of fiscal year 2015 and up 34.0% from the same quarter

---

[4]      Defendants only identify falsity and scienter in the "Issues Presented" section of their Motion.  Motion at 1.  Despite this limitation, Defendants nevertheless attempt to raise the issues of standing and loss causation as grounds for dismissal.  *Id*. at 3, 13, 17-18, 21.  The Court should refuse to entertain Defendants' standing and loss causation arguments because Defendants failed to identify such issues within the "Issues Presented" section of their Motion in accordance with Local Rule 7-4(a)(3).

of the previous year; (2) Generally Accepted Accounting Principles ("GAAP") net income of $26.7 million, up 15.8% from the third quarter of fiscal year 2015 and up 61.4% from the same quarter of the previous year; (3) net sales for the fourth quarter ended June 30, 2015 totaling $573.6 million, up 21.7% from $471.2 million in the third quarter of fiscal year 2015; (4) GAAP net income for the fourth quarter of fiscal year 2015 of $26.7 million, or $0.51 per diluted share, an increase of 61.4% from net income of $16.5 million, or $0.34 per diluted share in the same period from the previous year; (5) non-GAAP net income for the fourth quarter of $30.0 million, or $0.57 per diluted share, compared to non-GAAP net income of $19.4 million, or $0.40 per diluted share, in the same quarter of the prior year; (6) net sales for the fiscal year ended June 30, 2015 of $1,991.2 million, up 35.7% from $1,467.2 million for the fiscal year ended June 30, 2014; (7) an increase in GAAP net income for fiscal year 2015 to $101.9 million, or $2.03 per diluted share, an increase of 88.1% from $54.2 million, or $1.16 per diluted share, for fiscal year 2014; and (8) non-GAAP net income for the fiscal year 2015 of $111.6 million or $2.15 per diluted share, an increase of 77.4% compared to $62.9 million or $1.34 per diluted share for fiscal year 2014.  *Id.*  The Company stated further that "Supermicro delivered record revenues in the fourth quarter of 34% growth over last year and posting $1.99 billion for the full fiscal year 2015 which was 35.7% above last year." *Id.*  Super Micro also issued guidance for the Company's revenue for its first quarter of fiscal 2016.  ¶48.

These statements were false and misleading because on November 16, 2015, Super Micro admitted that "the Company has determined that for certain contracts which included extended product warranties, revenue relating to the extended warranties was recorded as revenue in prior periods instead of being deferred and amortized over the contractual period" and that "***the cumulative impact on revenue that should have been deferred for the applicable contracts for the three prior fiscal year period ended June 30, 2015 was $9.3 million . . . .***"  ¶35.  On

November 16, 2015, Defendants further announced that "*[i]n November 2015, the Company identified errors related to revenue which was recognized prior to meeting US GAAP revenue recognition criteria which impacted fiscal years 2013, 2014 and 2015.*"  *Id*.  Accordingly, Defendants admitted that *the cumulative impact of this error pertaining to prior periods through June 30, 2015 was to overstate net sales and net income by $9,259,000 and $5,926,000, respectively*.  *Id*.  The guidance that the Company issued was also false and misleading because Defendants were aware of – or deliberately reckless in not knowing – of the Company's practice of channel staffing and the existence of deteriorating Days Sales Outstanding ("DSO") and inventory days.  ¶¶52-58.  Thus, Plaintiff adequately alleges that Defendants falsely reported the Company's revenue, net sales, net income, and guidance on August 4, 2015.

### 2.   On October 22, 2015, Defendants Reported False Financial Results for the Company

On October 22, 2015, Super Micro announced: (1) quarterly net sales of $530.2 million, down 7.6% from the fourth quarter of fiscal year 2015 and up 19.6% from the same quarter the previous year; (2) GAAP net income of $20.5 million, down 23.2% from the fourth quarter of fiscal year 2015 and down 1.8% from the same quarter the previous year; (3) net sales for the first quarter ended September 30, 2015 totaling $530.2 million, down 7.6% from $573.6 million in the fourth quarter of fiscal year 2015; and (4) GAAP net income for the first quarter of fiscal year 2016 of $20.5 million, or $0.40 per diluted share, a decrease of 1.8% from net income of $20.9 million, or $0.42 per diluted share in the same period the previous year.  ¶59.

These statements were false and misleading because, as the Company admitted, the sales information reported for "quarter ended September 30, 2015 was [overstated by] $1.3 million." ¶¶62, 66, 67.  Additionally, the condensed consolidated statement of operations and condensed consolidated balance sheet included in the Company's Form 10-Q filed on November 16, 2015 reflected aggregate net sales for the quarter ended September 30, 2015 of $519.6 million, *$10.6*

*million less than reflected in the Company's October 22, 2015 press release*.  *Id*.  The reduction in net sales also resulted in a reduction in GAAP net income of $6.8 million, or $0.13 per diluted share, from $20.5 million reported in the Company's October 22, 2015 press release to $13.7 million in the Form 10-Q filed on November 16, 2015.  *Id*.  Accordingly, Plaintiff adequately alleges that the financial results reported for the Company on October 22, 2015 were false.

> ### 3.    Defendants Reported False and Misleading Financial Information Regarding the Company's Operating Expenses Involving Costs Related to Certain Marketing Expenses

Super Micro also reported false and misleading financial information regarding the Company's operating expenses related to certain marketing expenses.  For example, on August 4, 2015, CFO Hideshima represented that "[s]equentially, operating expenses were higher due to higher prototype and testing fees of approximately $1.4 million, and higher marketing and promotion costs of $0.9 million to support the development and promotion of new products."  ¶36.  Additionally, on August 31, 2015, Super Micro announced that it "recently discovered certain irregularities regarding certain marketing expenses and additional time is required for the Registrant to complete its investigation of the matter."  ¶38.  On September 10, 2015, Super Micro filed its 2015 10-K, in which Defendants made no reference to "irregularities regarding certain marketing expenses" that the Company announced on August 31, 2015, and made no changes to the Company's financial results issued on August 4, 2015.  ¶¶37-39.

As the Ninth Circuit has declared, once defendants chose to speak regarding the Company's operations, "they were bound to do so in a manner that wouldn't mislead investors . . . ."  *Berson v. Applied Signal Tech.*, 527 F.3d 982, 987 (9th Cir. 2008); *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 707–08 (9th Cir. 2016).  Accordingly, Super Micro's Form 10-K and CFO Hideshima's statements were false and misleading because they contained material omissions regarding the Company's "irregularities regarding certain marketing expenses" that

significantly impacted the Company's stock price on August 31, 2015 and October 9, 2015, when the Company subsequently disclosed the impact of such "irregularities." ¶39.

### 4. Defendants' Misrepresentations Were Material

The misstatements in Super Micro's financial results were material. ¶¶73-84. For example, the misstatements were material regarding Super Micro's reporting of net sales. ¶73. Super Micro reported net sales of $519,618,000 in its Form 10-Q, and the out-of-period adjustment that Super Micro reported was $9,259,000. *Id*. The restated net sales amount was $528,877,000. *Id*. Thus, the error reported by the Company in net sales regarding Super Micro's August 22, 2015 release was $1,358,000. *Id*. This misstatement, therefore, constituted a material error because $528,877,000 was ***below*** the lower end of the guidance that the Company provided on August 10, 2015 of $529 million to $530 million. *Id*.

Additionally, Super Micro's misstatements were also material regarding the Company's non-GAAP gross margin. ¶74. Indeed, the guidance that the Company provided on October 8, 2015 was for 15.6% to 15.7%. ¶75. In the Company's October 22, 2015 release (and within Slide 16 of the Company's investor presentation on the same date), this metric met the Company's guidance. *Id*. The restated metric, therefore, ***missed the Company's guidance*** and is therefore material. ¶76. *See* Staff Accounting Bulletin No. 99, Release No. 99 (Aug. 12, 1999) SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45, 150 (1999) ("SAB No. 99"), 1999 WL 1123073 (Aug. 12, 1999) (holding that one consideration "that may well render material a quantitatively small misstatement of a financial statement" is "whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise").

The Company's misstatements also had a material effect on the Company's non-GAAP net income per common share – diluted. ¶77. The guidance that the Company provided on October 8, 2015 was "a range of $0.44 to $0.45," where the actual range announced on October 22, 2015

was at the higher end of the range – $0.45. *Id*. Thus, the Company's restated metric was ***below*** the guidance provided by the Company. *Id*. The Company's misstatements, moreover, had a material impact upon Super Micro's non-GAAP operating margin. ¶79. This metric was contained on page 10 of the Company's October 22, 2015 investor presentation and on the call that Super Micro conducted with analysts. *Id*. The actual guidance that Super Micro provided in the Company's October 22, 2015 release was 6.8%, close to the Company's stated "target" range. ¶80. The restated metric, however, is 6.5%. *Id*. Thus, the Company's non-GAAP operating margin was ***significantly lower*** than the margin that Super Micro reported on October 22, 2015. ¶81. The Company's misstatements were also material because they affected the Company's "systems" business. ¶¶82, 83.

Defendants' assertion that their misrepresentations are immaterial fails. Motion at 1-3, 13-16. First, Defendants are attempting to advance a bright-line standard for materiality that conflicts with Supreme Court precedent. In both *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011), the Supreme Court declared that courts cannot impose a bright-line, quantitative test to determine materiality. *Basic*, 485 U.S. at 236 & n.14; *Matrixx*, 563 U.S. at 39-40. Second, Defendants' argument also conflicts with SEC guidelines that dictate that materially cannot be assessed basely solely upon quantitative factors. SAB No. 99 "provides relevant guidance regarding the proper assessment of materiality." *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 717 (2d Cir. 2011). Indeed, SAB No. 99 states that "there are numerous circumstances in which misstatements below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material . . . ." 1999 WL 1123073, at *2-4. Third, courts have held adjustments of financial results of far less magnitude

than those alleged here to be material.[5]   Finally, "[q]uestions of materiality . . . involve assessments peculiarly within the province of the trier of fact." *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1178 (9th Cir. 2009) *aff'd, Matrixx*, 563 U.S. 27.   "Thus, the ultimate issue of materiality is appropriately resolved as a matter of law only where the omissions are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality." *Siracusano*, 585 F.3d at 1167; *see also S.E.C. v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) ("Determining materiality in securities fraud cases should ordinarily be left to the trier of fact."). Thus, the Court should reject Defendants' materiality arguments.

Defendants also claim that they cannot be held liable because the Company purportedly met or exceeded its forecasts.  Motion at 4, 16, 19-20.  Defendants, however, ignore that "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."  *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008); *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (holding that although a statement technically "may have been true," "the statement was plainly misleading when made.").  Thus, "a statement that is literally true can be misleading and thus actionable" at least where it as an omission that "affirmatively create[s] an impression of a state of affairs that differs in a *material* way from the one that actually exists."  *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (italics in original).  Certainly, if Super Micro's investors were satisfied that the Company was meeting and exceeding its forecasts,

---

[5]     *See, e.g.*, *In re Sipex Corp. Sec. Litig.*, No. 05-392, 2005 WL 3096178, at *2 (N.D. Cal. Nov. 17, 2005) (a "$350,000 revenue item" for a company "with reported quarterly revenues of about $17 million" "cannot be said to be immaterial as a matter of law at the pleading stage"); *In re Home Health Corp. of Am. Sec. Litig.*, No. CIV.A. 98-834, 1999 WL 79057, at *6-*7 (E.D. Pa. Jan. 28, 1999) (impact on net revenues of less than 2.8% was not immaterial as a matter of law); *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 410-11 (S.D.N.Y. 1998), *abrogated on other grounds by In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75-66 (2d Cir. 2001) (misstatements that impacted company's profits by no more than 2.54% and most by less than 1% were not immaterial as a matter of law).

1  then the Company's stock would not have plummeted $2.58 per share, or 9.43%, to close at

2  $24.77 on September 1, 2015, $4.92 per share, or 15.5%, to close on October 9, 2015 at $26.90

3  per share, $3.07 per share, or 10.5%, to close at $26.18 per share on November 11, 2015, as the

4  truth began to emerge.  ¶¶47, 58, 63; *Batwin v. Occam Networks, Inc*., No. 07-2750 CAS (SHx),

5  2008 WL 2676364, at *22 (C.D. Cal. July 1, 2008).

6          **5.      Defendants' SOX Certifications Were Materially False and Misleading**

7          The SOX certifications that CEO Liang and CFO Hideshima made were also false and

8  misleading.   Contrary to Defendants' assertion that SOX certifications are merely "personal,

9  subjective" statements (Motion at 8-10) – courts have held that false SOX certifications are

10  actionable.  *See, e.g*., *In re Am. Serv. Grp., Inc*., No. 3:06-0323, 2009 WL 1348163, at *42 (M.D.

11  Tenn. Mar. 31, 2009) ("Plaintiffs' certification claims against [defendants] are actionable");

12  *Wieland v. Stone Energy Corp*., Civil Action No. 05-2088, 2007 WL 2903178, at *7 (W.D. La.

13  Aug. 17, 2007) ("Plaintiffs have also sufficiently alleged that the Sarbanes-Oxley certifications

14  that [defendants] signed in connection with [the company's] quarterly reports contained false and

15  misleading information."); *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 745-46 (E.D. Mich.

16  2007) (holding that defendants' SOX certifications demonstrated the falsity of defendants'

17  statements).  "For these certifications to have any substance, signatories to the certifications must

18  be held accountable for the statements."  *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp.

19  2d 1164, 1189-1190 (C.D. Cal. 2007).

20          Here, Defendants repeatedly represented that the Company's internal controls over

21  financial reporting were adequate and that the Company's financial statements fairly presented the

22  financial condition and results of operations of the Company.  ¶¶26, 28, 30, 32, 40.  These

23  representations were false because Defendants were aware – or were deliberately reckless in not

24  knowing – that, as Defendants later acknowledged, "[b]ased on the reassessment of the deficiency

in the design of our revenue internal controls, we have determined that a material weakness existed in our internal control over financial reporting *as of June 30, 2015*." ¶¶41, 42. Accordingly, Plaintiff has adequately alleged falsity regarding Defendants' SOX certifications.

### 6. The Company Need Not Formally Restate Its Financial Results in Order for Defendants To Be Liable Under the Exchange Act

Defendants also suggest that they cannot be liable under the Exchange Act because the Company did not formally restate its financial results. Motion at 1-2. Defendants are wrong for two reasons. First, Defendants misstate the law by suggesting that Defendants can never be liable for securities fraud if a Company fails to restate its financial statements. Indeed, courts in this circuit have repeatedly declared that "the lack of a restatement" does not mean that Defendants "only engaged in legitimate conduct." *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245 (N.D. Cal. 2008); *see also Lloyd v. CVB Fin. Corp.*, No. CV1006256MMMPJWX, 2012 WL 12883522, at *15 (C.D. Cal. Jan. 12, 2012) (rejecting defendants' argument that a lack of a restatement absolves defendants of liability); *Alaska Elec. Pension Fund v. Adecco S.A.*, 371 F. Supp. 2d 1203, 1220 (S.D. Cal. 2005) ("The lack of a restatement is not dispositive when a plaintiff has otherwise met the PSLRA's pleading requirements."). Accordingly, "the fact that the financial statements for the year in question were not restated does not end [the plaintiff's] case when he has otherwise met the pleading requirements of the PSLRA." *LDK Solar*, 584 F. Supp. 2d at 1245. "To hold otherwise would shift to accountants the responsibility that belongs to the courts. It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements." *Id.* at 1245-46; *Lloyd*, 2012 WL 12883522, at *15; *Aldridge v. A.T. Cross*

1    *Corp.*, 284 F.3d 72, 83 (1st Cir. 2002).[6]

2         Second, Super Micro effectively restated its financial results during the Class Period.  For

3    example, Defendants admitted the condensed consolidated statement of operations and condensed

4    consolidated balance sheet included in the Company's Form 10-Q filed on November 16, 2015

5    reflected aggregate net sales for the quarter ended September 30, 2015 of $519.6 million – ***$10.6***

6    ***million less than reflected in the Company's October 22, 2015 press release***.  ¶67.  Super Micro

7    also announced that the Company's reduction in net sales also resulted in a reduction in GAAP net

8    income of $6.8 million, or $0.13 per diluted share, from $20.5 million reported in the Company's

9    October 22, 2015 press release to $13.7 million in the Form 10-Q filed on November 16, 2015.  *Id.*

10   Thus, the Company's Form 8-K/A effectively restated the Company's financial results reported on

11   Form 8-K on October 22, 2015.  *Id.*  Defendants' argument, therefore, is meritless.

12

13        **7.      The PSLRA's Safe Harbor Provision Does Not Protect Defendants'
                    False and Misleading Statements**

14        Defendants' misrepresentations are not protected by the PSLRA's safe harbor provision.

15   "Adequate cautionary language under the PSLRA must identify important factors that could cause

16   actual results to differ materially from those in the forward-looking statement."  *Quality Sys.*, 865

17   F.3d at 1148; 15 U.S.C. §78u-5(c)(1)(A).  "Defendants bear the burden of demonstrating that their

18

19   _____

20

21   [6]       *See also In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 889 (D. Minn. 2011)
     ("the lack of any such formal restatement does not preclude a claim for securities fraud"); *In re*

22   *Stellent, Inc. Sec. Litig.*, 326 F. Supp. 2d 970, 986 n.7 (D. Minn. 2004) ("[T]he fact that the
     financial statements for the year in question were not restated does not end Aldridge's case when

23   he has otherwise met the pleading requirements of the [the Reform Act]."); *Rosen v. Textron, Inc.*,
     321 F. Supp. 2d 308, 325 (D.R.I. 2004) (rejecting "an effort of a company to shift sole

24   responsibility for its accounting practices to its accountants" by arguing that Defendants could not
     be liable where there was no restatement); *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1222

25   n.4 (N.D. Okla. 2003) (holding that the fact that a company's "financial results were not restated
     does not mean that the financial results disseminated during the Class Period were accurate");

26   *Blatt v. Muse Techs., Inc.*, No. CIV.A. 01-11010-DPW, 2002 WL 31107537, at *10 n.29 (D.
     Mass. Aug. 27, 2002) ("the fact that the draft restatements were never actually filed cannot in and

27   of itself be fatal to the lead plaintiffs' claims").

28

statements are protected by the safe harbor." *In re STEC Inc. Sec. Litig.*, No. CV09-08536-JVS MLGX, 2011 WL 2669217, at *9 (C.D. Cal. June 17, 2011).

First, most of the misrepresentations alleged – which constitute the Company's financial statements and results – were assertions of historical or current fact to which the safe harbor provision does not apply. *Quality Sys.*, 865 F.3d at 1142.  Second, the safe harbor does not apply to the Company's statements regarding guidance because the disclaimers upon which Defendants attempt to rely are "factors that are so broad that they apply to ***any*** business that sells products to consumers." *Yanek v. Staar Surigcal Co.*, 388 F. Supp. 2d 1110, 1123 (C.D. Cal. 2005) (emphasis in original); *see also* Declaration of Margaret Austin in Support of Motion to Dismiss Second Amended Complaint, Ex. 11.  ***Any*** company that suffers from "poor product sales" or "difficulties in establishing and maintaining successful relationships" with distributors and vendors may experience actual results that differ from expected results.

Third, "[w]here, as here, forward-looking statements are accompanied by non-forward-looking statements about current or past facts, that the non-forward-looking statements are, or may be, untrue is clearly an important factor of which investors should be made aware." *Quality Sys.*, 865 F.3d at 1148.  Accordingly, "[b]ecause Defendants made materially false or misleading non-forward-looking statements" that accompanied Defendants' forward-looking statements, "virtually no cautionary language short of an outright admission that the non-forward-looking statements were materially false or misleading would have been adequate." *Id*.  Because "[n]o such cautionary language was provided" Defendants' forward-looking statements are not protected by the safe harbor provision. *Id*.

Finally, dismissal under the safe harbor defense "requires a stringent showing" by Defendants. *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017).  "There must be sufficient cautionary language or risk disclosure such that reasonable minds could not disagree

that the challenged statements were not misleading." *Id.* Because Defendants' disclaimers do not "preclude reasonable minds from differing on the question of whether the statements were misleading," dismissal is unwarranted. *In re Amylin Pharma., Inc. Sec. Litig.*, No. 01CV1455BTM (NLS), 2002 WL 31520051, at *10 (S.D. Cal. Oct. 10, 2002).

### B.   Plaintiff Adequately Alleges that Defendants' Misrepresentations Were Made With Scienter

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2); *Tellabs*, 551 U.S. at 314. "In this circuit, the required state of mind is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Quality Sys.*, 865 F.3d at 1144. Importantly, "courts must consider the complaint in its entirety . . . [t]he inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (italics in original). "Thus, Tellabs counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). Accordingly, often "the sum is greater than the parts." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 698 (9th Cir. 2012).

A strong inference of scienter arises if, "[w]hen the allegations are accepted as true and taken collectively," a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324-26. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences" – the inference need only be equally plausible to any non-culpable inference. *Id.* at 324. Moreover, "a tie goes to the plaintiffs when there are multiple plausible theories at the pleadings stage of litigation." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 n.8 (9th Cir. 2014).

1 **1.**    **The Departure of Several of the Company's Top Executives at the Same Time as the Audit Committee's Announcement of the Completion of its Accounting Investigation Supports a Strong Inference of Scienter**

2

3    The departure of several of the Company's key executives – including CFO Hideshima –

4 at the same time that Super Micro announced the completion of its accounting investigation

5 supports a strong inference of scienter.   *See, e.g.*, *In re Banc of California Sec. Litig.*, No.

6 SACV1700118AGDFMX, 2017 WL 3972456, at *8 (C.D. Cal. Sept. 6, 2017) (holding that an

7 executive's resignation on the same day that the company announced an SEC investigation added

8 "one more piece to the scienter puzzle"); *Bielousov v. GoPro, Inc.*, No. 16-cv-06654-CW, 2017

9 WL 3168522, at *6 (N.D. Cal. July 26, 2017) (holding that resignation of the company's president

10 bolstered the strong inference of scienter alleged); *In re Volkswagen "Clean Diesel" Mktg., Sales

11 Practices, & Prod. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 66281, at *14 (N.D. Cal. Jan. 4,

12 2017) ("Plaintiffs have pled sufficient facts to compel the inference that the [company]

13 resignations, firings, and suspensions are strongly indicative of scienter"); *Middlesex*, 527 F. Supp.

14 2d at 1187-1188 (holding that because defendant's resignation was "highly suspicious," it leaned

15 "heavily towards a finding of scienter").

16

17    On January 30, 2018, the Company announced the resignations of several high-level

18 executives – including CFO Hideshima – ***on the same day*** that the Company announced that its

19 Audit Committee had completed its investigation related to the Company's financial statements

20 and internal controls over financial reporting.   Sams Decl., Ex. 1.   Because "the timing of

21 Defendants' departures might suggest that the Company believed Defendants had been involved in

22 wrongdoing with respect to corporate finances" these facts support a strong inference of scienter.

23 *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975-976 (N.D. Cal. 2009).

24

25 **2.**    **The Confidential Witnesses Support a Strong Inference of Scienter**

26

27    Plaintiff can establish a strong inference of scienter through CW accounts by satisfying

28

two pleading requirements.  "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge.  Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter."  *Quality Sys.*, 865 F.3d at 1144-45.

First, Plaintiff sufficiently describes the CWs to support the probability that persons in these positions would possess the information alleged.  ¶¶88-91.  Second, the statements attributed to the CWs are indicative of scienter.  For example, CW1 stated that the Company's marketing team was very small and "corrupt."  ¶88.  Specifically, CW1 stated that the Company's marketing department would give away Super Micro's products, but would fail to account for the products or where the products were sent.  *Id*.  CW1 stated that this practice was most common with Intel CPU's.  *Id*.  CW1 also stated that his manager would have no problem compensating Super Micro customers or distributors using marketing expenses.  *Id*.  CW1 stated further that the Company's customers would buy Super Micro's products and obtain points.  *Id*.  According to CW1, the points were then used to obtain marketing-related merchandise.  *Id*.  Additionally, CW2 stated that the Company's marketing department had weekly co-op programs and that individuals in marketing might be under budget for particular campaigns.  ¶89.  If such were the case, the Company's marketing department would move co-op dollars from one customer to another to make up the difference.  *Id*.  According to CW3, the Company's sales people would have to obtain CEO Liang's signature on sales orders based upon the size of the order, and CW3 believes that the threshold was $1 million.  ¶90.

Further demonstrating scienter, CW4 stated that some salespeople at Super Micro shifted the dates on purchase orders at the Company, and that salespeople would ship products before the date requested by customers without seeking permission from the customer.  ¶92.  CW4 also

stated that the VP of Strategic Accounts shipped products without the consent of customers, and that customers refused shipments. *Id.* CW4 stated that Super Micro's management became aware of the products that the VP of Strategic Accounts shipped without the consent of the customer, and that Super Micro took no action and no changes occurred. *Id.*

CW4 stated further that the Company's marketing credits were supposed to be used for co-marketing, but that the Company routinely used these credits to provide discounts to customers for current purchases. ¶93. Additionally, CW4 said that Super Micro's management tracked all of the Company's orders and that co-marketing funds were automatically created. *Id.* CW4 also stated that Super Micro routinely used such co-marketing funds improperly for the use of "demos." ¶94. Additionally, according to CW4, many of Super Micro's customers were actually leasing products, not buying them, and believed that the Company's management recorded these transactions as sales rather than as leases. ¶95. Thus, the CW allegations support a strong inference of scienter.[7]

### 3. The Severity of the Company's Internal Control Problems Bolsters the Strong Inference of Scienter Alleged

The severity of the Company's internal control problems also supports a strong inference of scienter. *VeriFone*, 704 F.3d at 708-10. The Company's internal controls problems were so severe that they affected whether or not the Company met the guidance that Defendants provided

---

[7]     Defendants claim that the CW allegations are deficient because "they do not allege any communications with either Liang or Hideshima . . . ." Motion at 12-13. Courts have held, however, that when "plaintiffs' allegations do not directly connect the dots between a CW's knowledge and the individual defendants," this circumstance is not "fatal" and "will not be grounds for dismissing the complaint" if a strong inference of scienter is alleged based upon "a holistic evaluation of the allegations." *Robb v. Fitbit Inc.*, No. 16-CV-00151-SI, 2017 WL 219673, at *6 (N.D. Cal. Jan. 19, 2017); *see also Flynn v. Sientra, Inc.*, No. CV1507548SJORAOX, 2016 WL 3360676, at *14 n.8 (C.D. Cal. June 9, 2016) ("Although it is true that Plaintiffs do not allege with particularity how or why the confidential witness had personal knowledge regarding Zeini and Pigeon's activities, the Court finds that Plaintiffs have included sufficient allegations to demonstrate why the witness knew that it was important for Sientra to monitor Silimed's manufacturing process.").

to the market.  ¶¶73-84.  Additionally, the following facts also demonstrate scienter: (1) even though the critical accounting policy in the Company's Form 10-K describes non-extended warranty, it is nevertheless a warranty; (2) the very long duration of the period in which the Company's errors are repeatedly committed; (3) Defendants' deliberate non-disclosure of service revenue amounts; and (4) the small number of system sales in a quarter (for example, 84 sales contracts in the first quarter of 2016).  ¶85.  Super Micro's errors, moreover, occurred in several geographic regions, demonstrating that the errors were not isolated incidents.  ¶¶86-87.  Thus, Defendants' "failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter."  *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006).

### 4.   The Company's Implementation of Widespread Internal Reforms Supports a Strong Inference of Scienter

The Company's remedial actions also support a strong inference of scienter.  On February 4, 2016, the Company announced that it would implement: (1)  an "[i]nitiation of a review of extended warranty and any other deliverables in our bill of materials for all products;" (2) an "[i]ncreased oversight and monitoring by our management of extended warranty and other deliverables in our bill of materials for any new products;" and (3) a process "[d]ocumenting and tracking extended warranty and other deliverables in our contract matrix to ensure proper revenue recognition."  ¶96.  Additionally, on October 26, 2017, the Company announced that Super Micro's Audit Committee initiated an independent investigation to determine whether similar transactions were properly accounted.  ¶99.  These "house-cleaning and reforms do not follow innocent mistakes." *In re Sipex Corp. Sec. Litig.*, No. C 05-00392 WHA, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005).

### 5.   Defendants' Practice of Channel Stuffing is Indicative of a Strong Inference of Scienter

Defendants' practice of channel stuffing also bolsters the strong inference of scienter alleged.  "Channel stuffing" is "inducing distributors to buy substantially more inventory than they

can promptly resell" by offering "deep discounts" or threatening the loss of supply "if the inventory is not purchased." *In re St. Jude Med., Inc. Sec. Litig.*, Civil No. 10-0851 (SRN/TNL), 2011 WL 6755008, at *2 n.1 (D. Minn. Dec. 23, 2011).  Allegations of channel stuffing can be "particularly persuasive" in contributing to a strong inference of scienter. *Tellabs*, 551 U.S. at 337 n.2.  Thus, even where a company's financial statements are not "false," this practice "could at the very least cause those results to be misleading where it resulted in an overloaded supply chain that could not sustain impressive early results." *Cunha v. Hansen Nat. Corp.*, No. EDCV 08-1249-GW JCX, 2011 WL 8993148, at *2 (C.D. Cal. May 12, 2011).

Such is the case here.  The guidance that Defendants provided on August 4, 2015 was overly optimistic because Defendants were aware of – or deliberately reckless in not knowing – of the Company's practice of channel stuffing and the existence of deteriorating DSO and inventory days.  ¶52.  Indeed, in a report on October 8, 2015, Susquehanna stated that "[w]e believe management was ***overly aggressive*** with guidance in the face of macro/industry uncertainty and annual revenue cadence . . . ."  ¶53.  The Company's relatively high ratios, moreover, are consistent with channel stuffing, which analysts recognized.  ¶¶54-56.  Thus, Defendants' practice of channel stuffing also bolsters the strong inference of scienter alleged.

### 6.   Defendants' SOX Certifications Add to the Strong Inference of Scienter Alleged

Combined with other allegations, SOX certifications can support a strong inference of scienter.  *See, e.g.*, *VeriFone*, 704 F.3d at 707-08 (holding that defendants' false SOX certifications added to the strong inference of scienter alleged); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016) (holding that defendants' "signing of Sarbanes-Oxley (SOX) certifications" added to the strong inference of scienter alleged); *Scott v. ZST Digital Networks, Inc.*, No. CV 11-03531 GAF (JCx), 2012 WL 538279, at *9 n.2 (C.D. Cal. Feb. 14, 2012) ("the Individual Defendants' signatures certifying the Company's

financial statements, along with the critical importance of the financial information being certified, support a finding of scienter").

Defendants repeatedly represented that the Company's internal controls over financial reporting were adequate and that the Company's financial statements fairly presented, in all material respects, the financial condition and results of operations of the Company. ¶¶26, 28, 30, 32, 40. These representations were false because Defendants were aware – or were deliberately reckless in not knowing – that, as Defendants later acknowledged, "*[b]ased on the reassessment of the deficiency in the design of our revenue internal controls, we have determined that a material weakness existed in our internal control over financial reporting as of June 30, 2015.*" ¶41. Contrary to Defendants' assertion (Motion at 11), the fact the material weakness existed *as of June 30, 2015* demonstrates that Defendants were either aware of the weakness or were deliberately reckless in not knowing. When viewed holistically – as the Court is required to do – all of these allegations collectively support a strong inference of scienter. *Tellabs*, 551 U.S. at 310.

**7. Defendants' Assertions Do Not Negate the Strong Inference of Scienter Alleged**

Defendants make three assertions that purportedly negate the strong inference of scienter alleged: (1) relying entirely upon out-of-circuit cases, Defendants claim that the Company's later assessment regarding internal controls was immaterial; (2) Defendants claim that Super Micro purportedly disclosed the alleged adverse information; and (3) the Individual Defendants claim they did not sell stock during the Class Period. Motion at 15-17, 20-24. All of these contentions fail.

First, as discussed above, the Company's misstatements were, in fact, material, and Defendants' attempt to impose a bright-line standard for materiality conflicts with controlling Supreme Court precedent and SEC guidelines. *Basic*, 485 U.S. at 236 & n.14; *Matrixx*, 563 U.S.

at 39-40; 1999 WL 1123073, at *2-4.  Second, citing no cases in this circuit, Defendants claim that because the Company purportedly disclosed the adverse information voluntarily, any inference of scienter is negated.  Motion at 16.  Courts within this circuit, however, have rejected such reasoning.[8]  Finally, contrary to Defendants' assertion (Motion at 3, 17, 23-24), the Supreme Court has repeatedly declared that the "absence of a motive allegation" is "not dispositive." *Matrixx*, 563 U.S. at 48; *see also Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal"). Indeed, "[s]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003).  Accordingly, these assertions do not negate the strong inference of scienter alleged.

### C.    Plaintiff Adequately Alleges Loss Causation

The PSRLA provides that "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. §78u-4(b)(4).  To plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  Accordingly, the pleading requirements for loss causation "are not meant to impose a great burden upon a plaintiff." *Id*.

Plaintiff has adequately alleged loss causation under *Dura*.  ¶¶47, 58, 63, 110-15. Defendants claim that because the Complaint purportedly "does not allege the practices or their

---

[8]     *See, e.g., Oaktree Principal Fund V, LP v. Warburg Pincus LLC*, No. CV158574PSGMRWX, 2017 WL 3187688, at *13 (C.D. Cal. Jan. 17, 2017) ("[defendant's] disclosure" of the adverse information "does not negate [defendant's] later statement that [the company] had resolved its problems"); *SEC v. Mozilo*, No. CV 09-3994-JFW MANX, 2010 WL 3656068, at *19 (C.D. Cal. Sept. 16, 2010) (holding that a company's disclosures were insufficient to negate an inference of scienter "especially given that the disclosures were incomplete, interspersed with misleading statements, scattered among various SEC filings and earnings calls, and buried in thousands of pages of prospectus supplements").

financial impact were disclosed to investors and negatively affected the stock price, as is required to plead loss causation in an (allegedly) efficient market case such as this one." Motion at 13. Defendants also claim that "the SAC does not allege that the market was informed that the forecast was missed due to 'channel stuffing.'" Motion at 21. Defendants' assertions fail. First, the Ninth Circuit has rejected Defendants' suggestion that the "market" must be "informed" of the alleged fraud to adequately allege loss causation. "Disclosure of the fraud is not a sine qua non of loss causation, *which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss*." *Mineworkers' Pension Scheme v. First Solar Inc.*, No. 15-17282, 2018 WL 626948, at *2 (9th Cir. Jan. 31, 2018); *Lloyd*, 811 F.3d at 1209-11. Second, even if Defendants' faulty loss causation standard were correct – and *First Solar* and *Lloyd* demonstrate that it is not – Defendants *admit* that Plaintiff alleges that an analyst considered the Company's August 4, 2015 statements regarding Super Micro's guidance as suggestive of "distributor inventory build," which is indicative of channel stuffing. Motion at 21; ¶52. "This is enough to give rise to a plausible inference that the disclosure was partially responsible for the loss. That is all a plaintiff must plead." *Washtenaw Cty. Employees Ret. Sys. v. Celera Corp.*, No. 5:10-CV-02604 EJD, 2012 WL 3835078, at *4 (N.D. Cal. Sept. 4, 2012).

### D.      Defendants' Standing Argument is Meritless

Without citing any authority in this Circuit, Defendants allege that Plaintiff lacks standing to challenge Defendants' statements that were purportedly made after his stock purchase. Motion at 3, 17-18. Courts within this Circuit, however, have squarely rejected Defendants' argument. *See In re VeriSign, Inc.*, No. C 02-02270 JW(PVT), 2005 WL 88969, at *4 (N.D. Cal. Jan. 13, 2005) ("Simply because certain class members were injured by misrepresentations that came *after* the Lead Plaintiffs had already acquired VeriSign stock does not mean that the Lead Plaintiffs cannot represent the class. Defendants' argument conflates Article III's standing requirements

with Fed. R. Civ. P. 23's class action requirements.") (italics in original); *see also Hoexter v. Simmons*, 140 F.R.D. 416, 422 (D. Ariz. 1991) ("the fact that later purchasers may have relied on statements made after the last date on which Class representatives purchased shares would not prevent the claims of both groups of purchasers from being brought in one action").   Thus, allegations that lead plaintiffs "relied upon Defendants' misrepresentations, acquired [company] stock at artificially inflated prices, and were damaged thereby" are "sufficient to establish standing." *VeriSign*, 2005 WL 88969, at *5; ¶12.

**E.     Plaintiff Sufficiently Alleges Control Person Liability**

Contrary to Defendants' assertion, Plaintiff adequately alleges a primary violation and the Individual Defendants' control over Super Micro.   ¶¶14-21; 125-28.   Thus, Plaintiff adequately alleges a control person claim.   *SEC v. Todd*, 642 F.3d 1207, 1222-24 (9th Cir. 2011).

**V.     CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motion.   If the Court grants any portion of the Motion, Plaintiff requests leave to amend.   *See Eminence Capital, L.L.C. v. Aspeon, Inc*., 316 F.3d 1048, 1052 (9th Cir. 2003) ("In this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error.").   Indeed, the Company has declared that "[a]dditional time is required to analyze the impact, if any, of the results of the investigation on the Company's historical financial statements . . . ."   Sams Decl., Ex. 1.

Dated: February 16, 2018

**GLANCY PRONGAY & MURRAY LLP**


By:  *s/ Ex Kano S. Sams II*
Lionel Z. Glancy
Robert V. Prongay
Ex Kano S. Sams II
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
Email: lglancy@glancylaw.com
        rprongay@glancylaw.com
        esams@glancylaw.com

*Lead Counsel for Lead Plaintiff and the Class*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On February 16, 2018, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 16, 2018, at Los Angeles, California.


                                             *s/ Ex Kano S. Sams II*
                                             Ex Kano S. Sams II

# Mailing Information for a Case 5:15-cv-04049-EJD Deason v. Super Micro Computer, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **David Allen Priebe**
  david.priebe@dlapiper.com,margaret.austin@dlapiper.com,carmen.manzano@dlapiper.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,bmurray@glancylaw.com

- **Ex Kano S. Sams , II**
  esams@glancylaw.com

- **Shirli Fabbri Weiss**
  shirli.weiss@dlapiper.com,emiko.gonzales@dlapiper.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)